**STUDIENGESELLSCHAFT KOHLE mbH, as Trustee for the Max-Planck-Institut für Kohlenforschung, Appellant,**

v.

**NORTHERN PETROCHEMICAL COMPANY, Appellee.**

**Appeal No. 85–1054.**

United States Court of Appeals, Federal Circuit.

Feb. 10, 1986.

Arnold Sprung, Sprung, Horn, Kramer & Woods, New York City, for appellant. With him on brief was Nathaniel D. Kramer.

Edmund J. Sease, Zarley, McKee, Thomte, Voorhees & Sease, Des Moines, Iowa, for appellee. With him on brief was Dennis L. Thomte; Donald F. Haas, Omaha, Neb., of counsel.

Thomas F. Reddy, Jr., Stanton T. Lawrence, III, and Joseph V. Colaianni, Pennie & Edmonds, New York City, were on brief, for amicus curiae, El Paso Products Co.

Gordon R. Coons and Bruce M. Gagala, Leydig, Voit, Osann, Mayer & Holt, Ltd., Chicago, Ill., were on brief, for amicus curiae, Union Carbide Corp. Thomas I. O'Brien and Paul W. Leuzzi, II, Danbury, Conn., also on brief.

Before NEWMAN, Circuit Judge, COWEN, Senior Circuit Judge, and BISSELL, Circuit Judge.

PER CURIAM.

The judgment of the United States District Court for the Northern District of Illinois, *Studiengesellschaft Kohle mbH v. Northern Petrochemical Company*, 225 USPQ 194 (N.D.Ill.1984), which held invalid all the claims of United States Patent No. 4,125,698 (the '698 process patent) on the basis of double patenting with United States Patent No. 3,113,115 (the '115 catalyst patent), is reversed.

The ruling of the district court that the appellant had not been guilty of laches or other inequitable delay in obtaining the '698 process patent is affirmed.

## Background

In 1980 Studiengesellschaft Kohle mbH (SGK), as trustee for the Max-Planck-Institut für Kohlenforschung, filed suit against Northern Petrochemical for infringement of both the '698 process patent and the '115 catalyst patent. The issue of infringement of the '115 catalyst patent was settled by agreement, and Northern Petrochemical paid damages for its two years of operation from 1978 until the expiration of the '115 catalyst patent in 1980.

The parties stipulated that the '698 patent was infringed if valid, and that validity was not challenged under 35 U.S.C. §§ 102 and 103. The affirmative defenses of double patenting, patent misuse, and laches were raised, and the district court established that the burden of proof was with Northern Petrochemical. Following a bench trial, the court held for Northern Petrochemical on the issue of double patenting and for SGK on the issues of misuse and laches. SGK appeals the judgment of invalidity based on double patenting, and Northern Petrochemical reasserts the issue of laches.

The '698 process patent, entitled "Polymerization of Ethylenically Unsaturated Hydrocarbons", is the invention of Karl Ziegler, Heinz Brell, Heinz Martin, and Erhard Holzkamp (the applicants). The claims are directed to a process for polymerizing alpha-olefins to produce high molecular weight polymers. For details of prosecution within the Patent and Trademark Office (PTO), reference is made to the district court's opinion. In brief, the '698 process patent issued on application Serial No. 770,484, a continuation-in-part of three prior applications including application Serial No. 482,412 filed January 17, 1955.

The 482,412 application as filed contained claims directed to a process for polymerizing ethylene, and also to a novel catalyst composition used in the polymerization process. On September 21, 1955 the examiner required restriction between the process and composition claims, as follows:

Restriction is required to one of the following inventions:

I. Claims 1–23, which pertain to a process for polymerizing ethylene, and which are classified like the Larson patent in 260–94.9.

II. Claims 24–28, 30 and 31, which pertain to a catalyst containing an organometallic composition, and which are classified like the Gehrke patent in Class 252–431.

III. Claim 29 which pertains to organic compounds of aluminum, and which are classified in Class 260–448, like the Coates patent.

The reason for requiring division lies in the fact that the catalysts of Group II are not limited in utility to polymerizing ethylene as in Group I, nor need any catalysts at all be formed from the pure compounds of Group III.

In response, the applicants elected the process claims of Group I, reserving the right to the other claims. On October 29, 1958 applicants filed Serial No. 770,484 as a continuation-in-part of Serial No. 482,412, containing the process claims of Group I plus additional process disclosures and claims from two related patent applications, Serial Nos. 514,068 and 527,413.

On the same date, October 29, 1958, applicants also filed application Serial No. 770,413 as a continuation-in-part of Serial No. 482,412, containing the catalyst claims of Group II plus additional catalyst disclosures and claims from the same two related patent applications. The 770,413 application issued as the '115 catalyst patent on December 3, 1963. Claim 1 of the '115 catalyst patent is as follows:

1. Polymerization catalyst essentially consisting of an aluminum compound having the general formula RR'AlX, in which R is a member selected from the group consisting of hydrogen, alkyl radicals and aryl radicals, R' is a member selected from the group consisting of hydrogen, alkyl radicals and aryl radicals, and in which X is a member selected from the group consisting of hydrogen, halogen atoms, alkoxy radicals, aryloxy radicals, secondary amino radicals of the formula

in which R" and R"' are hydrocarbon radicals, secondary acid amide radicals of the formula

in which R" and R"' are as given above, mercapto radicals, and radicals of carboxylic acids of the formula

$$-\, O -\!\! \underset{\displaystyle O}{\overset{\displaystyle O}{\|}}{C} -\! R''$$

in which R" is as given above, with a heavy metal compound selected from the group consisting of salts, freshly precipitated oxides and hydroxides of metals of groups IV–B, V–B, and VI–B of the periodic system, including thorium and uranium, metals of group VIII of the periodic system and manganese.

Meanwhile three patent interferences were proceeding in the PTO, involving related patent applications of SGK including Serial No. 514,068. On February 10, 1961 prosecution of the 770,484 process application was stayed by the Patent Office, the examiner having refused SGK's offer to avoid overlap with various claims in interference if the Office would allow the 770,-484 application to issue. In 1977 the Office reopened prosecution of the 770,484 application, resulting in the grant on November 14, 1978 of the '698 process patent.

Claim one, the broadest claim of the '698 process patent, is as follows:

1. Method for the production of high molecular polymers which comprises contacting an alpha-olefin with a catalyst formed by a mixture of a first and second component, said first component essentially consisting of an aluminum compound of the general formula RR'AlX, in which R and R' are each a member selected from the group consisting of hydrogen, alkyl radicals and aryl radicals, and X is a member selected from the

group consisting of hydrogen, halogen atoms, alkoxy radicals, and aryloxy radicals, said second component essentially consisting of a non-ionized heavy metal compound selected from the group consisting of salts and freshly precipitated oxides and hydroxides of metals of Groups IV–B, V–B and VI–B of the Periodic System including thorium and uranium, metals of Group VIII of the Periodic System and manganese, and recovering the high molecular polymer formed.

The district court determined that "[e]very definitional limit of the two components of the catalyst defined in the process claims of the '698 patent are included in the basic catalyst composition '115 patent." 225 USPQ at 201. The court observed that there was "no known disclosed utility for the '115 catalyst except for the polymerization of ethylenically unsaturated hydrocarbons, such as alpha-olefins". *Id.* at 198.

In response to SGK's argument that the two patents were obtained because of a restriction requirement by the patent examiner, the court held that 35 U.S.C. § 121 did not insulate the '698 process patent from double patenting because the catalyst of the '115 patent and the process for polymerizing olefins using that catalyst are "the same invention". *Id.* at 199–201.

The district court held that the protection of 35 U.S.C. § 121, third sentence, did not apply, because the catalyst patent claims could be used to show that the catalyst and process patents claimed the same invention without being "used as a reference" against the process patent claims. *Id.* at 200. Referring to the restriction requirement, the court said "[t]hey were divided at the request of the Patent Office. Whether this request was proper or not is irrelevant to validity of the '698 patent." *Id.* at 198.

### Analysis
#### A.

In challenging the district court's holding that the catalyst and process patents claim the same invention, SGK asserts that the

inventions are not the same and that there was no double patenting in any event because of 35 U.S.C. § 121.

SGK emphasizes that the '115 patent claims a catalyst composition, independent of its use. SGK also points out that the catalyst as claimed in the '115 patent is of broader scope than the catalyst in the '698 process claims: catalyst component X in the '115 patent claims includes certain secondary amino radicals, secondary acid amide radicals, mercapto radicals, and carboxylic acid radicals, none of which is included in the catalyst component of the '698 process claims.

SGK asserts that the invention of the '115 catalyst patent can be practiced in non-infringing ways: that one can make and sell the catalyst without infringing the '698 process patent, and that one can use the catalyst to polymerize other than alpha-olefins, referring specifically to butadiene, as well as to make low molecular weight polymers of alpha-olefins. Northern Petrochemical asserts that these other purported uses are not of practical significance, and that the only significant use is for the polyermization of alpha-olefins. As evidence that these patents claim the same invention, Northern Petrochemical points out that issuance of the '698 patent extended SGK's control of the process that Northern Petrochemical had been practicing using the catalyst claimed in the '115 catalyst patent.

■ We agree with SGK, and hold that because the two patents claim different statutory classes of subject matter, composition and process, they are not the same invention. The Court of Customs and Patent Appeals held that this alone is sufficient to avoid same invention-type double patenting. In *In re Taylor*, 360 F.2d 232, 234, 149 USPQ 615, 617, (CCPA 1966), the court rejected the Patent Office position that the applicant's product claim was nothing more than the process patent claims in different language, and therefore that they defined the same invention:

The appealed claim defines a product per se in terms of its physical properties as well as in terms of a process for making it. The *invention* defined by the appealed claim is a product. The patent claims define a process. Thus, two independent, albeit related inventions are presented, the appealed claim covering a product and the issued patent claiming a process. [Emphasis in original.]

*See also In re Walles,* 366 F.2d 786, 789, 151 USPQ 185, 188–89 (CCPA 1966), wherein the court held that there was no double patenting as between two sets of composition claims:

[B]efore two sets of claims may now be said to claim the "same invention," they must *in fact* claim the *same subject matter.* . . .

\* \* \* \* \* \*

. . . We may not ignore or discard any portions of the claimed subject matter. [Emphasis in original.]

*Taylor* and *Walles* were cited with approval in *In re Boylan,* 392 F.2d 1017, 157 USPQ 370 (CCPA 1968). The claims on appeal in *Boylan* were for a process of using a composition. The applicant's prior patent claimed the composition and a method for making it. The court held that the inventions were not the same, on the ground that a composition and its process of use are statutorily different classes of invention.

Useful guidelines were provided in *In re Vogel,* 422 F.2d 438, 441, 164 USPQ 619, 621–22 (CCPA 1970):

By "same invention" we mean identical subject matter. Thus the invention defined by a claim reciting "halogen" is not the *same* as that defined by a claim reciting "chlorine," because the former is broader than the latter. . . . A good test, and probably the only objective test, for "same invention," is whether one of the claims would be literally infringed without literally infringing the other. If it could be, the claims do not define identically the same invention. [Emphasis in original.]

This court followed these guidelines in *Carman Industries, Inc. v. Wahl,* 724 F.2d 932, 940–41, 220 USPQ 481, 487–88 (Fed. Cir.1983), wherein it applied the test for "same invention" double patenting, between a design and a utility patent, as whether one claimed invention could be practiced without infringing the other.

This body of CCPA law as represented in *Boylan, Walles, Taylor, Vogel,* and other cases, dealt with the "same invention" issue. Our predecessor court refused to find double patenting based, variously, on differences in claimed subject matter; on different statutory classes; on the existence of non-infringing uses; on differences in the breadth of the claims; and on the absence of "cross-reading" (whether the claims of one patent can be infringed without infringing the other). The criterion depended on the facts of the case. When the test laid down in *Vogel* is applied to the facts of this case, we find that the inventions covered by the '115 and '698 patents are not the same, and that the district court erred in holding that there was same-invention type double patenting in this case. In view of this conclusion, we need not and do not address the issue of whether section 121 protects a patentee from an allegation of same-invention type double patenting.

### B.

The district court made no findings as to obviousness-type double patenting. We agree with SGK that Northern Petrochemical offered no evidence of the scope and content of the pertinent art, other than the '115 patent, the level of skill in the art, or what would have been obvious to a person skilled in the art. Consequently, we hold that obviousness-type double patenting is not involved in this case.

Even if Northern Petrochemical had attempted to raise this issue before the district court, the defense of obviousness-type double patenting would not have been available in light of 35 U.S.C. § 121. Section 121 provides in pertinent part:

A patent issuing on an application with respect to which a requirement for re-

striction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them. . . .

### C.

■ Northern Petrochemical also argues that the district court erred in ruling that SGK had not been guilty of laches or other inequitable delay in obtaining the '698 method patent.

Northern Petrochemical points out that the applicants had overcome all of the Patent Office's rejections of the process claims in the 770,484 application by November 1, 1960, except for the rejection for failure to distinguish from the claims of related applications that were involved in interferences. SGK emphasizes that the applicants attempted to overcome this rejection by offering to abandon the conflicting claims in the related applications as soon as the interferences were concluded, and on this basis the applicants requested issuance of the process claims. The examiner refused. On February 10, 1961 the Board of Appeals granted applicants' alternative request to suspend prosecution of the 770,484 application until termination of the interferences.

As of January 6, 1976, two of the three interferences had terminated but in one a civil action had been brought pursuant to 35 U.S.C. § 146. (The district court observed that in 1984 that matter was still pending). The applicants filed a request that the PTO resume proceedings on the 770,484 application, but the PTO did not act on the request. On September 19, 1977 the applicants filed another request, and on November 21, 1977 the PTO issued an official action withdrawing the final rejection but making new rejections. These rejections were duly overcome and the 770,484 application issued as the '698 patent on November 14, 1978.

The district court found that the time required to prosecute the 770,484 application to issuance "resulted in large part from circumstances in the Patent Office and actions taken by the Patent Office", that the "applicants' actions in response thereto involved no deliberate or calculated delay on the part of the applicants or their attorneys", and that "abandonment of the application during the interference would have resulted in a loss of the interference by the applicants, which could prejudice the applicants' right to obtain *any* patent on the 770,484 application." *Studiengesellschaft Kohle*, 225 USPQ at 196 (emphasis in original).

The district court held that SGK had "not violated nor exceeded any time limits provided by law, and [Northern Petrochemical] lack[ed] evidence of laches or intentional delay under the patent law". *Id.* at 199. SGK points out that the claims of the application that Northern Petrochemical argues should have been issued relate only to the polymerization of ethylene, of which Northern Petrochemical has not been charged with infringement. The district court held that Northern Petrochemical had failed to prove necessary elements of laches, namely, reliance by defendant and detriment. *Id.*

On the record before us, the court's findings are not clearly erroneous, and we discern no error in the conclusion that SGK had not delayed inequitably and that the prolonged period of pendency was due to the PTO and not to the applicants. *Cf. Young Engineers, Inc. v. United States International Trade Commission*, 721 F.2d 1305, 1317, 219 USPQ 1142, 1153 (Fed. Cir.1983).

### D.

Northern Petrochemical argues that the court should hold the second patent invalid where, as in this case, the second patent provides the patentee with continued domination of the commercially valuable use of the invention covered by the first patent. We are asked to consider the social consequences of upholding the '698 patent. Northern Petrochemical asserts that this court "could refuse to enforce the '698

patent after expiration of the '115," on the basis that "[t]o hold otherwise would put the public interest at the mercy of the patent examiner...."

Congress in 1952 refused to truncate the term of patents issued following a restriction requirement, although the question was squarely before it. In *In re Bauman*, 683 F.2d 405, 410 n. 12, 214 USPQ 585, 589 n. 12 (CCPA 1982), the court observed that "[t]he deletion of this provision indicates that Congress did not intend limitations such as patent expiration date with that of the patent issued on the parent application to be imposed on the patent issuing on the continuation application."

Nor does Northern Petrochemical suggest how much of the PTO's delay a court should accept before drawing the line against the patentee. SGK, it was found by the district court, did not cause the delay. As was observed in *In re Sarett*, 327 F.2d 1005, 1011, 140 USPQ 474, 480 (CCPA 1964), "[t]he exigencies of prosecution commonly compel the issuance of interrelated applications with overlapping disclosures at widely divergent times."

■ The patent grant is not for the right to use the patented subject matter, but only for the right to exclude others from practice of the patented subject matter.[1] The Court of Customs and Patent Appeals said in *In re Heinle*, 342 F.2d 1001, 1005, 145 UPSQ 131, 135 (CCPA 1965):

> Should there be such other [dominating] patents still in force when a patent expires, the monopoly of the expiring patent is not "extended"; that monopoly ends and any other patents which may affect the rights of the public to use something the expiring patent discloses

stand on their own legal foundations. The expiration of a patent right is not a guarantee of a right to use.

Neither party denies that the '698 process patent is of this dominating category. Both sides, and *amici*, have discussed the public policy aspects of this case on its particular facts. The variety of their views emphasizes that the statute as enacted represents a balance of policies. The delay in patent issuance that we here confront is appallingly long. The culprit, however, was not SGK but the tortuous interference practice. We are without authority to set our own arbitrary limit. "If the law as it has been written by Congress creates anomalous situations, then it is for Congress to decide whether to change the law." *In re Hilmer*, 424 F.2d 1108, 1113–14 n. 6, 165 USPQ 255, 259 n. 6 (CCPA 1970).

### Conclusion

The district court erred in holding the '698 process patent invalid on the ground of double patenting. The judgment dismissing the complaint on the holding of invalidity is reversed and the case is remanded to the district court for further proceedings in accordance with this opinion.

REVERSED AND REMANDED.

NEWMAN, Circuit Judge, concurring.

I share the court's opinion that the '115 catalyst patent and the '698 process patent do not claim the same invention, as this court and our predecessor court have defined "same invention", and thus that "same invention double patenting" does not lie. I believe, however, that 35 U.S.C. § 121[1] controls the result in this case,

---

1. 35 U.S.C. § 154 provides:
   Every patent shall ... grant ... for the term of seventeen years ... the right to exclude others from making, using, or selling the invention....

1. The first three sentences of 35 U.S.C. § 121 are:
   ■ If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions.

■ If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application.
■ A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the

wherein the application for the '698 patent was filed as result of a restriction requirement imposed by the Commissioner. Under these circumstances, the legal and policy arguments raised by Northern Petrochemical are not controlling of the issue: these arguments were answered by Congress when the statute was enacted.

Prior to the 1952 Patent Act, courts and patentees were aware of the unfairness that resulted when the Patent Office required restriction or division between claims in a patent application, thus requiring that a second patent application be carved out of the first, and then rejected the second application on the basis of the first. *See In re Eisler*, 203 F.2d 726, 97 USPQ 361 (CCPA 1953). Even if the patentee had objected to the restriction requirement, the rejection of the second application could be upheld, as in *In re Kauffman*, 152 F.2d 991, 68 USPQ 178 (CCPA 1946). And even when the Patent Office had required restriction and then had granted separate patents, courts had occasionally invalidated patents for double patenting. *See, e.g., Remington Rand Business Service, Inc. v. Acme Card System Co.*, 71 F.2d 628, 22 USPQ 1 (4th Cir.), *cert. denied*, 293 U.S. 622, 55 S.Ct. 236, 79 L.Ed. 710 (1934).

The purpose of including § 121[3] in the 1952 Patent Act was to protect the patentee from the consequences of this PTO practice.[2] The first printed text of this remedial legislation included the following provision:

> courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.

**2.** For detailed discussion *see* Walterscheid, *Historical Development of the Law of Double Patenting Up Through the 1952 Patent Act*, 4 A.P.L.A.Q.J. 243, 260 (1976) ("double patenting prior to the Patent Act of 1952 constituted a massive, complex, confusing, and conflicting area of the patent law").

**3.** "Proposed Revision and Amendment of the Patent Laws", characterized as a "Preliminary Draft with Notes" for the Committee on the

If two or more patents are issued in consequence of a requirement for restriction under this section, no claim of any of said patents may be held invalid solely by reason of its inclusion in a separate patent.[3]

P.J. Federico's accompanying Note stated that "[n]either of the resulting patents can be held invalid over the other merely because of their being divided in several patents."[4] The Preliminary Draft also proposed to cut off the terminal portion of the second-issuing patent,[5] but H.R. 9133, introduced by Representative Bryson, did not adopt the proposal that the later-issuing patent expire on the same date as the earlier patent. The revised text stated:

> If two or more patents are issued in consequence of a requirement for restriction under this section, neither patent may be used as a reference against the other for the purpose of section 103 of this title....[6]

The next bill, H.R. 3760, included the courts as well as the Patent Office in its prohibition against use as a reference of a patent resulting from a requirement for restriction.[7] The hearing record on H.R. 3760 contains the Report of the Laws and Rules Committee of the American Patent Law Association, which states that:

> Section 121 gives statutory expression to division practice and specifically forbids the use of either the original or the division as a reference against the other....[8]

Judiciary of the House of Representatives, at 21 (Comm. Print January 10, 1950).

**4.** *Id.* at 22.

**5.** *Id.* at 21.

**6.** H.R. 9133, 81st Cong., 2d Sess. § 120 (1950).

**7.** H.R. 3760, 82d Cong., 1st Sess. § 121 (1951).

**8.** *Hearings before Subcommittee No. 3 of the Committee on the Judiciary, House of Representatives, Eighty-Second Congress, First Session on H.R. 3760*, 82d Cong., 1st Sess., Serial No. 9, at 45 (1951).

The hearing record also contains a letter from H.R. Hawgood of Cleveland to Representative Bryson, stating:

> Section 121: In general, this seems to be a useful section, but the reference to the use of a parent or divisional case, against another is a bit ambiguous, particularly in the mention of section 103. Would it not be better to specify clearly that neither a parent nor divisional case could be used as a reference against the other for any purpose? [9]

The phrase "for the purpose of section 103 of this title" was deleted from the section as enacted.

The Revision Note for § 121, in the House and Senate Reports accompanying the 1952 Patent Act, summarized the law as follows:

> [N]either of the resulting patents can be held invalid over the other merely because of their being divided in several patents.[10]

In "Commentary on New Title 35, U.S. Code 'Patents'", Charles J. Zinn, law revision counsel to the House Judiciary Committee's Subcommittee No. 3 which was both the Subcommittee on Patents and the Subcommittee on Revision of the Laws, stated:

> The Commissioner is given the discretion of requiring a division. The use of either the original or the division as a reference against the other is specifically forbidden....[11]

P.J. Federico advised the bar in 1951, at the time H.R. 9133 was introduced:

> The intention of everybody involved is that double patenting is eliminated either in the application stage or in the patent stage....[12]

Since its enactment, the courts and the Patent Office have without significant exception upheld broadly the remedial purpose of 35 U.S.C. § 121. In 1963 Judge Rich discussed § 121 as follows:

> To sum it up, the operation of the rule is that claims to inventions closely related to the invention claimed in the patent and not patentably distinguishable therefrom must be included in the same patent unless the applicant has been forced to make them in a separate application by a requirement of restriction, in which case section 121 of the statute acts to waive the rule.

*In re Zickendraht*, 319 F.2d 225, 232, 138 USPQ 22, 27 (CCPA 1963) (Rich, J., concurring). *See also In re Schneller*, 397 F.2d 350, 355, 158 USPQ 210, 215 (CCPA 1968), wherein Judge Rich wrote for the court: "Neither do we have any requirement of restriction, as provided in 35 U.S.C. 121, to excuse [double patenting]."

Practitioners have for decades relied on this provision, as discussed by the PTO Board of Appeals in *Ex parte Nantz*, 141 USPQ 523, 528 (Bd.App.1963):

> The third sentence of this code section provides that neither the Patent Office nor the courts can use the patent issuing as a result of a requirement to divide against the still pending application. This provision of the third sentence would have meaning only if there has been an error in requiring restriction, since if the inventions between which restriction has been required are patentably different, the provision is not required, as shown by the case law. Only when there has been an error is it necessary to invoke the provision of the third sentence.

After the 1952 Patent Act, very few of the cases that raised questions of double patenting involved § 121. None of the cases discussed in the court's opinion in the case at bar, i.e., *Taylor, Walles, Boylan, Vogel,* or *Carman,* involved a PTO restric-

---

9. *Id.* at 211.

10. S.Rep. No. 1979, 82d Cong., 2d Sess. 20, *reprinted in* 1952 U.S.Code Cong. & Ad.News 2394, 2413; H.R.Rep. No. 1923, 82d Cong., 2d Sess. 20 (1952).

11. 1952 U.S.Code Cong. & Ad.News 2507, 2515.

12. Proceedings, Mid-Year Meeting, Section of Patent, Trademark, and Copyright Law, American Bar Association, held March 8–10, 1951, Shoreham Hotel, Wash., D.C., Vol. 1 at 257.

tion requirement. Those courts that discussed § 121 generally held that § 121[3] guards against invalidity based on double patenting if the division into more than one patent was due to a restriction requirement by the PTO. *See, e.g., St. Regis Paper Co. v. Bemis Co., Inc.,* 403 F.Supp. 776, 787, 188 USPQ 107, 117 (S.D.Ill.1975), *rev'd on other grounds,* 549 F.2d 833, 193 USPQ 8 (7th Cir.), *cert. denied,* 434 U.S. 833, 98 S.Ct. 119, 54 L.Ed.2d 94, 195 USPQ 465 (1977) ("That procedure was in all respects in compliance with the provisions of 35 U.S.C. § 121. It must be presumed that the Examiner resolved any question of double patenting when he allowed the divisional application, absent clear and convincing proof to overcome that presumption."); *Illinois Tool Works, Inc. v. Foster Grant Co., Inc.,* 395 F.Supp. 234, 256, 181 USPQ 553, 569 (N.D.Ill.1974), *aff'd,* 547 F.2d 1300, 192 USPQ 365 (7th Cir.1976), *cert. denied,* 431 U.S. 929, 97 S.Ct. 2631, 53 L.Ed.2d 243, 194 USPQ 576 (1977) ("Under the statute (35 U.S.C. § 121), the claims of the two patents in suit must be considered with respect to each other in the same manner as one considers the claims of a single patent with respect to each other."); *Illinois Tool Works Inc. v. Solo Cup Co.,* 179 USPQ 322, 366 (N.D.Ill.1973) ("The Patent Office did require restriction and consequently 35 U.S.C. 121 renders any double patenting inquiry moot...."); *Union Carbide Corp. v. Dow Chemical Co.,* 619 F.Supp. 1036, 1059 (D.Del.1985) ("If it was Congress' determination that the need to streamline the patenting process and remove some of the pitfalls that plagued patentees outweighed the disadvantage of permitting two like patents to coexist, it is not for the Court to second guess the wisdom of that determination.").

These decisions demonstrate that from the practical viewpoint § 121 is particularly important when the restriction requirement is asserted to have been imposed in error, such that the court is asked to decide whether separate applications should have been required to have been filed. This is reinforced because of the limitation on appellate review of PTO restriction require-

ments. *See In re Hengehold,* 440 F.2d 1395, 1404, 169 USPQ 473, 480 (CCPA 1971) ("actions of examiners in requiring restriction under § 121 [are] within the supervision of the Commissioner and beyond the pale of review by the board").

As a corollary, the safeguard of § 121[3] does not apply if the divisional application was voluntarily filed by the applicant and not in response to a PTO restriction requirement. *In re Schneller,* 397 F.2d 350, 354, 158 USPQ 210, 215 (CCPA 1968); *In re Wright,* 393 F.2d 1001, 1002 n. 1, 157 USPQ 519, 520 n. 1 (CCPA 1968). Nor does it apply if the restriction requirement was withdrawn by the examiner. *In re Ziegler,* 443 F.2d 1211, 1216, 170 USPQ 129, 132 (CCPA 1971).

The parties have not cited, and we have not found, any case wherein a court has invalidated, on the basis of double patenting, a patent filed as the result of a § 121 restriction requirement. Northern Petrochemical refers to *Eversharp, Inc. v. Philip Morris Inc.,* 256 F.Supp. 778, 784, 150 USPQ 98, 103 (E.D.Va.1966), *aff'd per curiam,* 374 F.2d 511, 153 USPQ 91 (4th Cir.1967). In that case, however, the district court stated that "[t]he vice of plaintiff's '857 blade patent is not double patenting", and invalidated the divisional patent on other grounds. In *Pierce v. Hewlett-Packard Co.,* 220 F.2d 531, 533, 105 USPQ 50, 51–52 (1st Cir.), *cert. denied,* 350 U.S. 833, 76 S.Ct. 69, 100 L.Ed. 744, 107 USPQ 362 (1955), the court held that it was not bound by an incorrect restriction requirement, because "[p]laintiff's patent [was granted in] 1938. It was, therefore, impossible for the plaintiff's patent to have been issued on an application which was required to be restricted under the 1952 act and consequently § 121 is inapplicable...."

Since the 1952 Patent Act, § 121 has protected patentees from the need to prove, before the PTO or the courts, that the claims of the divisional application are to an independent and distinct invention, when the patent examiner had determined during

examination that the inventions were independent and distinct, and by requiring restriction had refused to examine the claims to any non-elected invention. The patent applicant thereafter had either to place the non-elected claims in a new patent application, or to abandon them. Section 121[3] effects a form of estoppel that shields the applicant from having to prove the correctness of the restriction requirement in order to preserve the validity of the second patent.

35 U.S.C. § 121 of course does not provide that multiple patents may be granted on the identical invention. To illustrate an identical invention, *Vogel* uses the hypothetical example of claims that differ only in the use of the expression 36 inches as opposed to 3 feet. But such theoretical bright lines do not make lawsuits. The variety of possible situations shown in the litigated cases on double patenting pays tribute to the wisdom of the legislators of § 121.

The Commissioner recognized the burden that § 121 placed on the PTO, and in section 804.01 of the Manual for Patent Examining Procedure (MPEP) (5th ed. 1983) the examiner is cautioned concerning the Office's responsibility:

> [Section 121's] nullification of double patenting as a ground of rejection or invalidity in such cases imposes a heavy burden on the Office to guard against erroneous requirements for restriction where the claims define essentially the same inventions in different language and which, if acquiesced in, might result in the issuance of several patents for the same invention.

The deplorably long time between issuance of the two patents before us points up other systemic difficulties, but does not authorize the court to depart from the plain language and intent of § 121. As the court said in *Illinois Tool Works Inc. v. Solo Cup Co.*, 179 USPQ at 364, "[t]o permit a double patenting attack on the ... patent is to completely emasculate 35 U.S.C. 121."