**PHARMACIA & UPJOHN COMPANY,
Sankyo Company Limited, and Takeda Chemical Industries, Ltd., Plaintiffs–Cross Appellants,**

v.

**RANBAXY PHARMACEUTICALS, INC. and Ranbaxy Laboratories Limited, Defendants–Appellants.**

**No. 03–1536, 03–1566.**

United States Court of Appeals,
Federal Circuit.

Dec. 23, 2003.

Before MAYER, Chief Judge, MICHEL and SCHALL, Circuit Judges.

MICHEL, Circuit Judge.

Ranbaxy Pharmaceuticals, Inc. and Ranbaxy Laboratories Limited (together, "Ranbaxy") appeal from the July 18, 2003 order of the United States District Court for the District of New Jersey granting the motion for preliminary injunction of Pharmacia & Upjohn Company, Sankyo Company Limited, and Takeda Chemical Industries, Ltd. (together, "Pharmacia") in Pharmacia's suit against Ranbaxy for infringement of U.S. Patent No. 4,668,783 ("'783 patent") for the reasons set forth in its memorandum opinion of July 16, 2003. *Pharmacia & Upjohn Co. v. Ranbaxy Pharm., Inc.*, 274 F.Supp.2d 597 (D.N.J. 2003). We hold the district court did not abuse its discretion in issuing the injunction. However, as to the cross-appeal, we hold it erred in requiring Pharmacia to post an injunction bond that would compensate Ranbaxy for sales not made during a 10–month period prior to the entry of the injunction during which Ranbaxy elected not to go to market although it had United States Food & Drug Administration ("FDA") approval to do so. *Pharmacia & Upjohn Co. v. Ranbaxy Pharm., Inc.*, No. 01–5303(MLC) (D.N.J. July 18, 2003) (*"July 18 Order"*). Accordingly, we *affirm-in-part* and *vacate-in-part* the district court's order and *remand* for a pro-rata reduction in the amount of the bond consistent with this decision.

## BACKGROUND

On December 19, 2000, Ranbaxy filed two Abbreviated New Drug Applications ("ANDAs") with the FDA seeking approval to market generic versions of the cefpodoxime proxetil antibiotic product Pharmacia & Upjohn Co. sells in the United States

under the trade name VANTIN®.[1] *Pharmacia & Upjohn,* 274 F.Supp.2d at 600. On November 15, 2001, after Ranbaxy declared its intention to market its products when approved, Pharmacia[2] filed this action seeking a declaration that Ranbaxy's manufacture, importation, use, sale, or offering for sale of those products in the United States during the term of the '783 patent[3] will infringe and an injunction prohibiting those activities. Four days later, Pharmacia sought an "Order to Show Cause" why Ranbaxy should not be preliminarily enjoined. On December 10, 2001, the district court entered the parties' stipulated order providing for expedited discovery on issues relevant to the requested injunction. The stipulated order also recited Ranbaxy's agreement to refrain from importing, selling, or offering for sale its products in the United States until 15 days after giving Pharmacia notice, giving Pharmacia the opportunity to seek a temporary restraining order.

The FDA approved Ranbaxy's application to market its oral suspension formulation on May 31, 2002. Meanwhile, on May 3, 2002, Pharmacia had filed the present motion for preliminary injunction. Oral argument on the motion was held on July 19, 2002. On July 18, 2003 the district court entered a preliminary injunction enjoining Ranbaxy from, inter alia, manufacturing, using, selling, offering for sale, or importing its generic cefpodoxime proxetil

products in the United States before the expiration of the '783 patent. *July 18 Order,* at 2. It ordered Pharmacia to post a bond in the amount of $15,000,000, "to cover [Ranbaxy's] alleged profit loss to date and continuing through the expiration date of the patent" in conjunction with the approved oral suspension product.[4] *Id.*

Ranbaxy timely appealed the injunction. Pharmacia filed a cross-appeal challenging the requirement for a bond to the extent it encompasses sales Ranbaxy allegedly lost by refraining from marketing its approved product prior to the entry of the injunction. We have jurisdiction pursuant to 28 U.S.C. § 1292(c)(1).

## DISCUSSION

I. *Ranbaxy's Appeal: Entry of the Injunction*

Whether to grant or deny a motion for preliminary injunction is a decision committed to the sound discretion of the district court, which must consider four factors: (1) the likelihood that the patentee will succeed on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest. *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1338–39 (Fed.Cir.2003). "We review the district court's decision for an abuse of discretion, a lapse that occurs when the

1. Ranbaxy agrees that the active ingredient in its accused products is structurally identical to that in Pharmacia's VANTIN® product.

2. Pharmacia & Upjohn Company and its co-plaintiff Sankyo Company Limited are the exclusive sublicensee and licensee, respectively, of the '783 patent, which is owned by co-plaintiff Takeda Chemical Industries, Ltd.

3. The present action was not brought pursuant to 35 U.S.C. § 271(e)(2). As an antibiotic drug that was the subject of an application for marketing approval filed prior to November

21, 1997, cefpodoxime proxetil is exempt from the "Orange Book" listing and patent certification requirements of 21 U.S.C. § 355. Food and Drug Administration (FDA) Modernization Act of 1997, Pub.L. No. 105–115, 111 Stat. 2326, Title I, § 125(d)(2).

4. In the wake of Ranbaxy's recent receipt of FDA approval to market its tablet formulation, the district court subsequently required Pharmacia to post a second $15,000,000 bond.

decision is premised on an error of law, a clearly erroneous finding of fact, or a clear error of judgment in weighing the factors." *Id.* at 1339.

Ranbaxy challenges the entry of the injunction on the ground that the district court erred in determining that Pharmacia had established a reasonable likelihood of success on the merits in that the district court (1) erroneously construed the claims and (2) incorrectly held that Ranbaxy had failed to raise a substantial question of invalidity regarding the '783 patent. It

further asserts that the district court erred in according Pharmacia the benefit of a presumption of irreparable harm and that Pharmacia otherwise failed to establish irreparable harm.

### A. Claim Construction

The '783 patent, entitled "Thiazolylacetamido Cephalosporin Compounds," was issued on May 26, 1987. It has six claims; only claim 1 is independent:

1. A compound of the formula:

wherein $R^4$ *is a residue of a nucleophilic compound selected from hydroxyl, mercapto, cyano, azido, amino, carbamoyloxy, carbamoylthio and thiocarbamoyloxy, said group being unsubstituted or substituted by alkyl of up to three carbons, and $R^5$ is hydroxyl or lower alkoxy.*

'783 patent, col. 39, I. 26 to col. 40, I. 14 (emphasis added). The emphasized limitation, defining the $R^4$ substituent, is at issue.[5] Specifically, Ranbaxy contends that a methoxy (-$OCH_3$) residue, which occupies the $R^4$ position in both Pharmacia's VANTIN® products and the accused products, is not encompassed by the phrase "hydroxyl ... substituted by alkyl of up to three carbons." More specifically, Ranbaxy argues that one of ordinary skill in the art

would not read "substituted" in claim 1 to modify "hydroxyl."

As support for its position, Ranbaxy notes (and Pharmacia agrees) that "substituted or unsubstituted" in claim 1 cannot modify every residue recited in the $R^4$ Markush group because, as a matter of chemistry, two of the recited residues— cyano and azido—cannot be "substituted" with an "alkyl of up to three carbons" because they lack substitutable hydrogen atoms. It argues that the recitation of "alkoxy," a conventional reference to the genus including methoxy, in the claim's definition for the $R^5$ substituent (but not for $R^4$) shows that $R^4$ and $R^5$ have different meanings, and that the patentee knew how to include "alkoxy" substituents had it meant to.

5. According to Pharmacia, claim 2 of the '783 patent, directed to "[a] pharmaceutically acceptable ester of the compound of claim 1," covers its VANTIN® product (and, correspondingly, the accused products), as marketed, while claim 1 recites the chemical form of the antibiotic as it exists in the body after the drug has been metabolized.

Similarly, Ranbaxy points to the written description's definition of $R^4$: "–W–R wherein *W represents oxygen* or sulfur atom and *R represents hydrogen,* carbamoyl, N-alkylcarbamoyl, thiocarbamoyl, N-alkylthiocarbamoyl, an acyl, sulfamoyl, alkylsulfonyl or hetero ring," '783 patent, col. 4, I. 67 to col. 5, I. 4, and argues that there, the patentee "could easily have defined 'R' to include alkyl, the most elementary of residues, and thereby define $R^4$ as alkoxy." Ranbaxy further relies on the absence of an example in the '783 patent's lengthy written description of a compound in which $R^4$ is methoxy or alkoxy, and its use of the terms "methoxy" and "alkoxy" when referring to other substituents, including $R^5$, in the claimed structure.

Ranbaxy cites further to the declaration of its expert, who testified that in accordance with the "naming convention" used by organic chemists, (1) a "methoxy residue ... would not be referred to as a 'methyl-substituted hydroxyl'" because "chemists would ... not ordinarily refer to a residue as a 'substituted' version of the 'original' residue if the residue were so altered by the substitution that its basic chemical and physical characteristics were fundamentally changed," and a methoxy residue "does not have the general physical and chemical properties of a hydroxyl residue"; (2) "[c]ompounds having hydroxyl residues are known as alcohols" whereas "[c]ompounds having alkoxy residues are known as ethers"; and (3) a methoxy residue in the $R^4$ position is not a "substituted hydroxyl residue" because no "hydroxyl residue" remains.

Pharmacia responds that the "substituted or unsubstituted" clause of the $R^4$ limitation, as a matter of grammar, modifies every residue recited in the Markush group. Therefore, with a nod to the fact that two of the recited residues cannot be "substituted" as recited therein, it con-

tends that the language of claim 1 supports the construction adopted by the district court, namely:

The words "said group being unsubstituted or substituted by alkyl of up to three carbons" means that (1) all of the structures named in the Markush group may be used in their unsubstituted form; and (2) all of the structures named in the Markush group that *can* be chemically "substituted" by replacing a hydrogen atom with "alkyl of up to three carbons," *may* be so substituted within the meaning of the $R^4$ limitation. This leads to the conclusion that an alkoxy residue such as methoxy ($-OCH_3$) may be substituted for the hydroxyl residue ($-OH$) within the meaning of the $R^4$ limitation of Claim 1.

*Pharmacia & Upjohn,* 274 F.Supp.2d at 609 (emphasis in original). It notes that the written description's definition of $R^4$, quoted in part above, continues as follows:

The typical residue of nucleophilic compound may be exemplified by hydroxyl, mercapto, cyano, azido, amino, carbamoyloxy, carbamoylthio, or thiocarbamoyloxy group, *or those substituted with alkyl (e.g., methyl,* ethyl, propyl, etc.).... Furthermore, the symbol $R^4$ may preferably represent a *mercapto group substituted* with a hetero ring which may be 5– or 6–membered one [sic]....

'783 patent, col. 5, II. 4–15 (emphasis added). Thus, says Pharmacia, not only does the written description specifically define $R^4$ as including "hydroxyl ... substituted with alkyl ... e.g., methyl"; it also undermines Ranbaxy's nomenclature argument, as Ranbaxy's expert asserted (and Pharmacia agrees) that a mercapto ($-SH$) group is comparable for purposes of the present inquiry to a hydroxyl ($-OH$) group. Furthermore, Pharmacia's expert declared that he is unaware of any nomenclature

convention a methoxy-including construction would violate, and that chemical substitutions, including those Ranbaxy acknowledges fall within the scope of the $R^4$ limitation, "virtually always change the physical and chemical properties of the starting compound to some degree." He further cited Morrison & Boyd, *Organic Chemistry*, 518 (3d Ed. Allyn and Bacon 1973), a "highly respected Organic Chemistry textbook," which states: "Reaction of an alcohol involves the breaking of either of two bonds: the C–OH bond with the removal of the -OH group; or the O–H bond, with the removal of -H. *Either kind of reaction can involve substitution, in which a group replaces the -OH or -H....*"

We conclude that the district court's construction, on this record, is correct. It is consistent with the language of claim 1 and the definition of $R^4$ in the written description, and at odds with nothing in the claims, written description, or prosecution history.[6] Pharmacia correctly notes that the $R^4$ limitation cannot properly be construed to exclude methoxy simply because the written description lacks such an example. *E.g., Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir. 1988) ("What is patented is not restricted to the examples, but is defined by the words in the claims if those claims are supported by the specification in the manner required by 35 U.S.C. § 112."). And the express disclosure of a "mercapto group substituted with a hetero ring" in the $R^4$ position bolsters the adopted construction, particularly in view of the parties' agreement that persons of ordinary skill in the art would regard mercapto and

hydroxyl groups as comparable in this context.

The district court also carefully considered the parties' extrinsic evidence and regarded Pharmacia's "more responsive to the issue of interpreting the $R^4$ limitation[,] based upon the applicable scientific authority and reasoning" and "more persuasive." *Pharmacia & Upjohn*, 274 F.Supp.2d at 609. It specifically noted that it had "not found in the extrinsic evidence any reason to deviate from the claim construction that appears appropriate based upon the intrinsic evidence discussed above." *Id.* On the record developed before the district court, we see no basis to question either conclusion, and, as noted above, we agree that the relevant intrinsic evidence supports its construction. Accordingly, since Ranbaxy acknowledges that its products fall within the scope of the claims as construed by the district court, we uphold the district court's finding that Pharmacia has met its burden of showing a reasonable likelihood of success on its claim of literal infringement.

### B. Obviousness-type Double Patenting

Ranbaxy contends that it has raised substantial questions as to the validity of the '783 patent, precluding Pharmacia from demonstrating that it will likely succeed on the merits of its infringement claim. It asserts that the district court clearly erred in concluding otherwise.

Specifically, it contends that the claims of the '783 patent are invalid under the judicially-created doctrine of obviousness-type double patenting over the claims of

---

6. Ranbaxy contends that during prosecution of an ancestor application, the patentee "acquiesced" to the examiner's assertion that a claim limitation reciting "groups convertible to a methoxy group" was "broader than the disclosure." That assertion, however, concerned the patent's disclosure as to a different R substituent—one not even recited in the claims of the '783 patent—and any "acquiescence" thereto is irrelevant to the construction of the $R^4$ limitation.

U.S. Patent No. 4,098,888 ("'888 patent") and U.S. Patent No. 4,355,160 ("'160 patent"). Likewise, but separately, it cites the claims of U.S. Patent No. 4,973,684 ("'684 patent"). The '888, '160, and '684 patents are part of the same patent family and share common inventors.

### 1. The '888 and '160 patent claims

The '888 patent issued on July 4, 1978 from U.S. Patent Application Serial No. 05/642,356, the original application in the family of patents at issue. It expired on July 4, 1995. The '160 patent, filed on March 4, 1981 and issued on October 19, 1982, claims the benefit of the filing date of the '888 patent.

For our purposes, the '888 and '160 patent claims recite compounds having essentially the same core chemical structure as those claimed in the '783 patent. The compounds claimed in the '888 and '160 patents differ from those claimed in the '783 patent in the chemical residues occupying the $R^4$ position. The '888 and '160 patent claims define the $R^4$ substituent as a "heterocyclic thio." During prosecution of the '160 patent, the patentee filed a terminal disclaimer to overcome a U.S. Patent and Trademark Office ("PTO") rejection of the claims as not patentably distinct over those of the '888 patent. Accordingly, the '160 patent also expired on July 4, 1995.

No such rejection was made during prosecution of the '783 patent.[7] Nonetheless, Ranbaxy argues that the claims of the '783 patent are not patentably distinct over those of the '888 or '160 patent because each patent claims a species of compounds belonging to the same genus: compounds having the recited core chemical structure wherein the $R^4$ substituent is a "heterothio residue."[8]

Ranbaxy defines a "heterothio" residue as one "contain[ing] a connecting sulfur atom and also contain[ing] one or more of nitrogen, oxygen, and/or additional sulfur atoms." It notes that in formulating restriction requirements during prosecution of the '888 patent, the PTO examiner used the term "heterothio" several times to refer to a group of compounds including the heterocyclic residue-containing compounds claimed in the '888 and '160 patents, and that the patentee used the same term in a consistent manner in responding.

■ We agree that Pharmacia is likely to withstand the validity challenge based on the '888 and '160 patent claims. First, "[t]he fact that a claimed compound may be encompassed by a disclosed generic formula does not by itself render that compound obvious." *In re Baird*, 16 F.3d 380, 382 (Fed.Cir.1994).[9] It necessarily follows, then, that even if the compounds claimed in the '888, '160, and '783 patents are species (or, more accurately, subgenera) of the "heterothio" genus Ranbaxy pro-

---

**7.** The same PTO examiner was responsible for the prosecutions of the '888, '160, '783, and '684 patents.

**8.** Specifically, Ranbaxy contends that the compounds of claim 1 of the '783 patent wherein $R^4$ is a "carbamoylthio" are members of the "heterothio" genus.

**9.** At issue in *Baird* was the nonobviousness requirement of 35 U.S.C. § 103. *Baird*, 16 F.3d at 381. However, "a double patenting of the obvious type rejection is 'analogous to [a failure to meet] the non-obviousness re-

quirement of 35 U.S.C. § 103,' except that the patent principally underlying the double patenting rejection is not considered prior art." *In re Longi*, 759 F.2d 887, 892 n. 4 (Fed.Cir. 1985); *see also Studiengesellschaft Kohle mbH v. N. Petrochemical Co.*, 784 F.2d 351, 355 (Fed.Cir.1986) (refusing to consider the issue of obviousness-type double patenting where the patent challenger "offered no evidence of the scope and content of the prior art, ... the level of skill in the art, or what would have been obvious to a person skilled in the art").

pounds, merely establishing that two species are members of the same genus does not prove that one is obvious over the other. The examiner's failure to require the term of the '783 patent extending beyond the expiration dates of the earlier '888 and '160 patents is consistent with this principle.[10]

nor offers evidence that its chemical or physical properties are similar to those of a heterocyclic thio residue. Accordingly, the district court's finding that "the cyclical, ringlike structure of the 'heterocyclic thio' that was approved in the '888 and '160 patents is markedly different in both form and function from the 'carbamoylthio' taught in the '783 patent" is not clearly erroneous. *See Pharmacia & Upjohn*, 274 F.Supp.2d at 613.

Furthermore, the district court did not clearly err in regarding Ranbaxy's evidence of obviousness as insufficiently persuasive. Ranbaxy relied on a statement in a declaration by Dr. Morimoto, one of the inventors of the patents at issue, during prosecution of the '684 patent.[11] That statement, in pertinent part, read: "[t]here is clear and unequivocal support that the tail position substituent lacks any criticality at all as to the generic aspect of the invention and that the group -$CH_2R^4$ is not even necessary." It was made, however, in the context of securing broader claims (over a rejection based on 35 U.S.C. § 112, first and second paragraphs) reciting that "$R^4$ is a residue of a nucleophilic compound." Given that context and

Second, as Ranbaxy's expert declared, a heterocyclic thio moiety "is a type of heterothio residue that contains a heterocyclic ring (a ring containing one or more sulfur, nitrogen and/or oxygen atoms in place of carbon atoms)," and Ranbaxy neither disputes that a carbamoylthio residue is a noncyclical moiety having the structure:

the language of the statement itself, at most it indicates that substituting one of the $R^4$ alternatives disclosed in the written description for another (or omitting the -$CH_2R^4$ group) does not destroy the "generic" function of the claimed invention. It does not state what Ranbaxy apparently suggests—that no $R^4$ substituent confers any patentably significant characteristics on the molecule over any other. It thus falls significantly short of the showing Ranbaxy must ultimately make (by clear and convincing evidence): the carbamoylthio residue-containing compounds of the '783 patent would have been obvious over the heterocyclic thio residue-containing compounds claimed in the '888 and '160 patents. The district court, therefore, did not clearly err in concluding that Ranbaxy failed to raise a substantial question of invalidity with respect to the '888 and '160 patent claims.

2. The '684 patent claims

■ Ranbaxy also contends that it has raised a substantial question regarding the validity of the '783 patent claims over the

---

10. The examiner's imposition of such requirements as to the claims of the '160 patent and the '684 patent (discussed *infra*) shows that he was properly cognizant of his duties with respect to subsequent claims drawn to patentably indistinct subject matter.

11. As discussed *infra,* the '684 patent was applied for and issued after the issue date of the '783 patent.

claims of the '684 patent. The '684 patent issued on November 27, 1990 from an application filed June 7, 1988. Like the '160 and '783 patents, it claims priority based on the '888 patent filing date. The compounds defined by claim 1 of the '684 patent differ in only one respect from those recited in claim 1 of the '783 patent: as noted above, the '684 patent claims define $R^4$ as "a residue of a nucleophilic compound." Thus the '684 patent claims recite a genus, one subgenus of which is claimed in the '783 patent. As a result, the '684 patent claims were allowed only after the patentee agreed to disclaim the portion of its term that would extend beyond the expiration of the '783 patent. The patentee, however, noting that claim 1 of the '684 patent also encompassed some of the compounds claimed in other members of the patent family, including the earliest-issued—the '888 patent—offered to disclaim the term beyond the latter's expiration date. Accordingly, the '684 patent expired (with the '888 and '160 patents) on July 4, 1995. Ranbaxy argues that the claims of the later-expiring '783 patent recite a mere obvious variant of the subject matter claimed in the now-expired '684 patent, and are thus invalid.

As Pharmacia notes, Ranbaxy did not rely on the '684 patent claims in its briefing at the district court. In fact, Pharmacia disputes that Ranbaxy raised this argument at all before the district court. The district court did not address the issue at all, and its absence of mention in the court's otherwise commendably thorough and detailed discussion of the parties' arguments itself at least suggests that the argument was not presented in a sufficiently clear and persuasive fashion to sat-

isfy Ranbaxy's burden of raising a substantial question of invalidity.

In any event, as presented, Ranbaxy's second double patenting argument fails for essentially the same reasons as its first.[12] The '684 patent's claimed genus does not necessarily render obvious the '783 patent's claimed subgenus. *Baird,* 16 F.3d at 382. And the Morimoto declaration, at least without further evidence regarding its meaning and its specific relevance, in the eyes of one of ordinary skill in the art, to the issue of the obviousness *vel non* of the subgenus over the genus is insufficient. Ranbaxy apparently would have had the district court draw certain inferences from Dr. Morimoto's statement. Even to the extent the statement could support such inferences, however, the district court was not required to draw them. Ranbaxy bore the burden of establishing that a substantial question of validity exists. The district court did not clearly err, on the evidence it reviewed and argument it heard, in finding Ranbaxy had failed to do so.

### C. Other Injunction Factors

■ Ranbaxy also challenges the district court's finding that Pharmacia would suffer irreparable harm were its motion denied. Pharmacia failed to make a "clear showing" of likelihood of success, it argues, and the district court therefore erred in presuming irreparable harm. *Cf. Amazon.com. Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed.Cir.2001) ("Irreparable harm is presumed when a clear showing of patent validity and infringement has been made."). The district court, however, did not rest solely on this ground. It noted several factors "lend[ing] further support to" its finding

---

12. Pharmacia urges us to declare that the '684 patent claims cannot invalidate the '783 patent claims in any event, because the '783 patent issued before the application for the '684 patent was filed. Because Ranbaxy failed to present persuasive evidence of obviousness, we need not reach Pharmacia's argument.

that irreparable harm was likely, including "loss of the remaining relatively short life of the patent, irretrievable price and market erosion for the patented product, loss of current research opportunities resulting from loss of funding, ... the speculative nature of damage assessments[,] and the difficulty of pursuing collection of that award in international legal systems." [13] *Pharmacia & Upjohn,* 274 F.Supp.2d at 614. Ranbaxy does not dispute these considerations; it simply asserts that it can satisfy a money judgment equal to Pharmacia's damage estimates. A district court, however, is entitled to consider additional factors, as it did here. *See Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1269 n. 2 (Fed.Cir.1985) (rejecting "the view that an alleged infringer's 'ability to compensate' must end a court's inquiry" as to irreparable harm). Consequently, the district court's finding of irreparable harm was not clearly erroneous.

The district court also thoughtfully balanced the hardships the parties would suffer and considered the public's interests: its desire for access to FDA-approved generic drugs and its "long-term interest in the benefits derived from the recognition and enforcement of intellectual property rights." *Id.* Given all of the foregoing, we cannot agree that the district court abused its discretion in granting Pharmacia's motion for preliminary injunction.

## II. *Pharmacia's Cross–Appeal: the Amount of the Bond*

■ Pharmacia challenges that portion of the district court's bond requirement pertaining to the 10 months between the FDA's approval of Ranbaxy's oral suspension product and the entry of the injunction. We exercise plenary review because the district court's authority to require bonding for losses occurring before an in-

junction is entered is at issue, not its assessment of the amount of asserted losses. *Sprint Comm. Co. v. Cat Comm. Int'l, Inc.,* 335 F.3d 235, 239 (3d Cir.2003).

Rule 65 of the Federal Rules of Civil Procedure requires the furnishing of a bond in exchange for the issuance of a preliminary injunction, to secure "the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65. The Third Circuit has observed that an injunction bond both " 'assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined [and] provides the plaintiff with notice of the maximum extent of its potential liability....' " *Sprint Comm.,* 335 F.3d at 240 n. 5 (quoting *The Continuum Co. v. Incepts, Inc.,* 873 F.2d 801, 803 (5th Cir. 1989)). As Pharmacia notes, however, the decision to keep Ranbaxy off the market between the October 2002 FDA approval and the July 2003 decision on Pharmacia's motion was Ranbaxy's. Whether motivated, as asserted, by a desire to postpone discovery except as relevant to the injunction motion or a belief that the district court would expeditiously issue its disposition, Ranbaxy, not Pharmacia, is responsible for the pre-injunction lost sales. Accordingly, we vacate that portion of the district court's order requiring a bond to cover the period prior to the issuance of the preliminary injunction. We remand directing reduction of the bond amount accordingly.

## COSTS

Each party shall bear its own costs.

---

**13.** Ranbaxy Laboratories Ltd. is headquartered in India.