PHARMACIA & UPJOHN
CO., et al., Plaintiffs,

v.

RANBAXY PHARMACEUTICALS,
INC., et al., Defendants.

No. CIV.A.01–5303 MLC.

United States District Court,
D. New Jersey.

July 15, 2003.

Karen A. Confoy, Sterns & Weinroth, PC, Trenton, NJ, for Plaintiffs.

Bryant K. Aaron, St. John & Wayne, Esqs., Elizabeth Wizeman Dollin, St. John & Wayne, L.L.C., Newark, NJ, for Defendants.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on motion by plaintiffs, Pharmacia & Upjohn Co. ("Pharmacia"), Sankyo Company Ltd. ("Sankyo"), and Takeda Chemical Industries, Ltd. ("Takeda") (collectively "plaintiffs"), seeking preliminary injunctive relief to prevent defendants, Ranbaxy Pharmaceuticals, Inc. and Ranbaxy Laboratories Ltd. (collectively "Ranbaxy") from marketing in the United States an FDA-approved generic copy of a prescription antibiotic product sold in the U.S. by Pharmacia under the trade name VANTIN®.

Plaintiffs possess the exclusive rights to U.S. Patent No. 4,668,783 ("the '783 patent"), which is due to expire on May 26, 2004. Plaintiffs contend that marketing of the Ranbaxy product in the U.S., prior to expiration of the '783 patent in May, 2004

will constitute patent infringement and that a preliminary injunction should be entered against Ranbaxy until that time.

The parties approach this case recognizing that Ranbaxy admits that its FDA-approved generic product will be an exact chemical copy of Pharmacia's VANTIN® product. Ranbaxy defends the injunction motion on two grounds. First, Ranbaxy contends that the '783 patent does not cover either the accused Ranbaxy product or VANTIN®, and therefore the Ranbaxy product does not infringe that patent. Alternatively, Ranbaxy contends that if the '783 patent does cover the Ranbaxy product, that patent should have expired long ago in 1995, when several related patents expired. Thus, Ranbaxy should now be free to market its product. This argument is based upon a theory of invalidity due to "obviousness-type double patenting," discussed below.

The Court has analyzed this motion based upon the written materials and the oral arguments presented by the parties.[1]

We conclude that plaintiffs have met their burden to demonstrate a right to the injunctive relief sought. Therefore, upon posting of an appropriate bond the motion will be granted pursuant to Federal Rule of Civil Procedure 65.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Takeda, a Japanese corporation, is the owner-assignee of the '783 patent, which was issued on May 26, 1987. (Confoy Decl., Ex. 1: U.S. Patent No. 4,668,783.)[2] Plaintiff Sankyo, a Japanese corporation, is the exclusive licensee of Takeda under the '783 patent. Plaintiff Pharmacia, a U.S. corporation, is an exclusive sub-licensee of Sankyo under the '783 patent, with the right to enforce it in cooperation with Sankyo. (Compl.¶ 10.) The '783 patent is directed to a class of antibiotic pharmaceutical products known in the industry as "cefpodoxime proxetil."[3] (Id. ¶ 9.) It will expire in May, 2004. (Wilp Decl. ¶ 4.)

Defendant Ranbaxy Pharmaceuticals, Inc. is a U.S. corporation, and defendant

---

1. The Local Civil Rules of this district provide that all motion papers except briefs are filed on the docket. Some of the papers were submitted under seal. Most of the papers include exhibits, which are identified when cited herein.

    The record on this motion (by docket entry number if so filed) is as follows: (1) plaintiffs' Notice of Motion (# 40), (2) plaintiffs' brief in support (11–19–01, resubmitted 6–18–02) ("Pl.Br."); Ranbaxy's opposition brief (6–28–02) ("Def.Br."); (3) plaintiffs' reply brief (7–12–02) ("Pl. Reply Br."); (4) plaintiffs' supporting documentation: Complaint (# 1) ("Compl."), declaration of Paul Richardson verifying the Complaint (# 3), declaration of Dr. Kenneth B. Sloan (# 4) ("Sloan Decl."), declaration of Karen A. Confoy, Esq. (# 5) ("Confoy Decl."), declaration of William R. Wilp (# 6) ("Wilp Decl."), supplemental declaration of Dr. Kenneth B. Sloan (# 49) ("Sloan Supp. Decl."); (5) Ranbaxy's supporting documentation: declaration of Vito A.

Canuso III, Esq. (# 42) ("Canuso Decl."), declaration of Dr. Rory P. Remmel (# 43) ("Remmel Decl."), Appendix of Citations (# 44), declaration of Dipak Chattaraj (# 45) ("Chattaraj Decl."), declaration of William R. Zimmerman, Esq. (# 55) ("Zimmerman Decl."), certification of Elizabeth W. Dollin, Esq. (# 60) ("Dollin Certif."); and transcript of oral argument (# 57) ("Oral Arg. Tr.").

2. A true copy of the '783 patent is attached as an exhibit to various filings, including the Complaint, the Amended Complaint, and the Confoy Declaration. This opinion will refer to that document, wherever found in the court filings relevant to this motion, simply as the '783 patent. Citation to column and line references in the '783 patent is provided as needed.

3. The title of the '783 patent is Thiazolylacetamido Cephalosporin Compounds. (Compl. ¶ 9; id., Ex. A.)

Ranbaxy Laboratories Ltd. is its parent company, headquartered in India. (Def. Br. at 2.) Both defendants are referred to as "Ranbaxy" for purposes of this motion. On December 19, 2000, Ranbaxy filed two Abbreviated New Drug Applications ("the ANDAs") with the U.S. Food and Drug Administration ("FDA"), seeking approval to market antibiotics containing cefpodoxime proxetil in the U.S. (Chattaraj Decl. ¶¶ 3–4; *id.*, Exs. 21, 23.) In this opinion, the Ranbaxy products that will be marketed in the U.S. pursuant to the ANDAs are referred to as "the Ranbaxy product." The ANDAs refer to the New Drug Application previously approved by the FDA for Pharmacia, which sells its cefpodoxime proxetil products under the trade name VANTIN®. (Charraraj Decl. ¶ 5.) On May 31, 2002, one of Ranbaxy's ANDAs received FDA approval.[4]

This action was commenced by plaintiffs on November 15, 2001, seeking declaratory judgment of infringement and injunctive relief based upon Ranbaxy's filing of the ANDAs and Ranbaxy's declared intention to market its product when approved. (Compl. at 1–6.) The Court entered a stipulated order on December 10, 2001 which provided, *inter alia*, for expedited discovery on the injunctive issues. (Docket entry # 18 ("12–10–01 Order").) The 12–10–01 Order provided that Ranbaxy would inform the Court of developments with its pending ANDAs, and would not market its product in the U.S. without giving 15–day notice to plaintiffs, in which

case plaintiffs could seek an emergency temporary restraining order. (*Id.* at 4.) Thereafter discovery was conducted on issues relating to injunctive relief, the pleadings were amended several times, and plaintiffs filed the present motion for preliminary injunction on May 3, 2002. The Court conducted oral argument on this and other pending motions on July 19, 2002.[5] (Oral Arg. Tr.) Ranbaxy has not commenced marketing its product as yet, pending the outcome of this motion.

## II. *DISCUSSION*

### A. *Jurisdiction, Standard for Preliminary Injunction*

This Court has subject matter jurisdiction in this patent dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a). Jurisdiction is also proper under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

■ A party seeking a preliminary injunction against an alleged infringer bears the burden of proving entitlement to relief based upon: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships tipping in its favor; and (4) a tolerable effect on the public interest. *See, e.g., Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1219 (Fed.Cir.1996); *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir. 1994). The Court must balance these factors against one another and against the

---

**4.** Ranbaxy's ANDA No. 65–082, which seeks approval to market an oral suspension containing cefpodoxime proxetil, was approved on May 31, 2002. (Chattaraj Decl. ¶ 3; *id.*, Ex. 22.) Ranbaxy's ANDA No. 65–083, which seeks approval to market tablets containing cefpodoxime proxetil, has not yet received FDA approval. (*Id.* ¶ 4.) Ranbaxy states, however, that the latter approval is expected imminently and that it is fully prepared to mar-

ket both forms of its product. (Ltr. to Court from Ranbaxy counsel dated 7–11–03.)

**5.** The other simultaneously pending motions are: (1) plaintiffs' motion to dismiss or strike defendants' affirmative defenses and counterclaims (# 36); and (2) defendants' motion to allow limited discovery on their antitrust counterclaims (# 53). Those motions are addressed in a separate opinion.

extent of the relief sought. *Hybritech Inc. v. Abbott Lab.,* 849 F.2d 1446, 1451 (Fed. Cir.1988).

■ The necessary showing of a likelihood of success must include evidence by the movant that there are no genuine grounds to challenge the "validity" of the patent or the "infringement" of the patent by the accused product. *Id.* However, a patent is statutorily presumed valid, 35 U.S.C. § 282, and this presumption places the burden of going forward, as well as the burden of persuasion, upon the party attacking validity—even at the preliminary injunction stage of the case. *Canon Computer Sys., Inc. v. Nu–Kote Intern., Inc.,* 134 F.3d 1085, 1088 (Fed.Cir.1998). The alleged infringer must at least identify some persuasive evidence of invalidity at the preliminary injunction stage to overcome the presumption of validity. *Id.*

As relevant to this motion, Ranbaxy here challenges plaintiffs' claim of infringement, and also asserts that the '783 patent is invalid due to obviousness-type double patenting. (*See* Def. Br.; Oral Arg. Tr. at 38.) Each of these issues presents the Court with the threshold task of making a preliminary claim construction.

## B. *Likelihood of Success—Infringement Issue*

### 1. *Legal Principles*

■ An infringement inquiry is a two-step process. First, the court must determine the scope and meaning of the patent claim as a matter of law. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (*en banc*), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Second, the properly construed claim is compared to the accused product to determine whether it contains *every* limitation of the claim or a substantial equivalent of any limitation not literally present.

*Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991). In their motion, plaintiffs allege that Ranbaxy's product infringes at least Claims 1 and 2 of the '783 patent. (Pl. Br. at 6.) However, since Claim 1 is independent and the other five claims of the '783 patent are dependent, the attention of the parties and of the Court on this motion has been focused upon construction of Claim 1. (Def. Br. at 5; Pl. Reply Br. at 2.)

■ There is a " 'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002). A claim term should generally be given its ordinary meaning unless the patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Id.* Thus, words in a claim are generally given their ordinary and customary meaning in the absence of a contrary indication in the patent specification or file history. *Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1196 (Fed.Cir.1994).

■ When interpreting an asserted patent claim, the court should look first to the intrinsic evidence of record, which is the patent itself, including the claims, the specification, and the complete prosecution history. *Markman,* 52 F.3d at 979. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996). Dictionaries, encyclopedias and treatises "are always available to the court to aid in the task of determining meanings that would have been attributed by those of skill in the relevant art to any disputed terms used by the inventor in the claims. . . . Thus, categorizing them as 'ex-

trinsic evidence' or even a 'special form of extrinsic evidence' is misplaced and does not inform the analysis." *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202–03 (Fed.Cir.2002). The Court has considered all of the parties' submissions on this motion, including the extrinsic expert declaration evidence provided by Dr.

Sloan for plaintiffs and Dr. Remmel for Ranbaxy, in light of these principles.

### 2. Construction of the '783 Patent Claims

Claim 1 of the '783 patent recites a compound having the following formula:

1. A compound of the formula:

wherein $R^4$ is a residue of a nucleophilic compound selected from hydroxyl, mercapto, cyano, azido, amino, carbamoyloxy, carbamoylthio and thiocarbamoyloxy, said group being unsubstituted or substituted by alkyl of up to three carbons, and $R^5$ is hydroxyl or lower alkoxy.

('783 patent, Col. 39:25 to 40:10–14 ("Claim 1").)

Plaintiffs allege that Ranbaxy's product literally infringes the $R^4$ limitation of Claim 1 of the '783 patent ("$R^4$" or "the $R^4$ limitation"). (Pl. Br. at 7–11.) Ranbaxy agrees that in both Pharmacia's VANTIN® products and Ranbaxy's product, the chemical structure of the $R^4$ component is identical. (Def. Br. at 6.) However, Ranbaxy contends that the $R^4$ limitation, properly construed, covers neither the Ranbaxy product nor VANTIN[R].[6] (*Id.* at 6–12.) The central inquiry on the infringement issues, therefore,

concerns the proper claim construction of the $R^4$ limitation of Claim 1.[7]

We begin with basic undisputed concepts in organic chemistry. According to standard convention, the compound molecule shown in Claim 1 is made up of atoms in which "H" designates hydrogen, "C" designates carbon, "N" designates nitrogen, "S" designates sulfur, "COOH" designates a carboxylic acid, and the term "R" designates groups of atoms (radicals) identified by class in the claim. (Pl. Br. at 7.) A "residue" is a collection of atoms that are in a definite shape, but a "residue" is

6. The '783 patent is one of a number of patents sublicensed to Pharmacia. Pharmacia originally marketed VANTIN® under licenses to two other patents, later acquiring a license also to exclusive use of the '783 patent. (Dollin Certif., Ex. C.)

7. The arguments on this motion have been directed to construction of Claim 1 because the other five claims of the patent are dependent claims. Claim 2, for example, states in its entirety: "A pharmaceutically acceptable ester of the compound of claim 1." ('783

patent, Col. 40:15–16.) Pharmacia advises that Claim 2 defines VANTIN® as it is actually marketed, and that Claim 1 describes the chemical form of the VANTIN® antibiotic as it exists in the body after the drug has been administered to and metabolized by the patient. (Pl. Br. at 7.) However, the parties focus upon construction of Claim 1, and not construction of the dependent claims, for purposes of this motion. (Oral Arg. Tr. at 39 67, 72–102, 123–127, 133.)

smaller than a molecule. (Oral Arg. Tr. at 53.)

One of the known types of "residue of a nucleophilic compound" is a "hydroxyl" group. A hydroxyl group is also known as "-OH." (Sloan Decl. ¶ 14; Remmel Decl. ¶ 12, Table 1.) This signifies one oxygen and one hydrogen atom bonded together. (Oral Arg. Tr. at 46.)

Another known type of "residue of a nucleophilic compound" is a "methoxy group," known as "-OCH$_3$." (Sloan Decl. ¶ 14; Remmel Decl. ¶ 12.) A methoxy group (-OCH$_3$) is one type of "lower alkoxy" group, meaning residues containing a small number of carbons. (Remmel Decl. ¶ 14.) Like a hydroxyl group, a methoxy group has one oxygen atom, but instead of being bonded to a hydrogen atom as in the hydroxyl structure, the oxygen atom in a methoxy group is bonded to a "methyl" group, known as "-CH$_3$." (*Id.*) A methyl group (-CH$_3$) is an "alkyl of up to three carbons." (Remmel Decl. ¶ 18; Def. Br. at 6.) [8]

It is chemically feasible to replace the hydrogen atom in a hydroxyl group (-OH) with an alkyl group such as a methyl group (-CH$_3$). (Sloan Supp. Decl. ¶ 6; Remmel Decl. ¶ 14.) As stated, the resulting combination is called a methoxy residue (-OCH$_3$) (Remmel Decl. ¶ 16.) The parties do not dispute that the substance located at the R$^4$ position in both Ranbaxy's product and VANTIN® is a methoxy residue (-OCH$_3$). (Def. Br. at 6.)

The sole dispute between the parties in construing the R$^4$ limitation of Claim 1, for purposes of this motion, is whether a methoxy residue (-OCH$_3$) is covered by the phrase "hydroxyl ... substituted by alkyl of up to three carbons." (Claim 1, emphasis added.) In other words, the parties disagree as to whether an alkoxy group such as -OCH$_3$ can be considered a "substituted hydroxyl" within the meaning of the Claim 1 definition of R$^4$. (Def. Br. at 6–7; Pl. Reply Br. at 5.)

Ranbaxy relies upon its expert declaration to contend that according to the ordinary and customary language of organic chemistry, there is a "naming convention" that would not refer to a methoxy group (-OCH$_3$) as a "methyl-substituted hydroxyl." (Remmel Decl. ¶¶ 13–15.) According to Ranbaxy's expert, this naming convention would normally refer to a particular residue as a "substituted" residue only when, after substitution occurs, the name applied to the resulting substituted substance is "fully consistent with the physical and chemical properties of the resulting residue," (*id.* ¶ 13) or if the "original" version of the residue is not "so altered by the substitution that its basic chemical and physical characteristics were fundamentally changed." (*Id.* ¶ 14.) Ranbaxy's expert concludes that since a methoxy "does not have the general physical and chemical properties of a hydroxyl residue," (*id.* ¶¶ 14, 22), and since "compounds having hydroxyl residues are known as alcohols" and "compounds having alkoxy residues are known as ethers," (*id.* ¶ 15), the plain meaning of "substituted" as used in the chemistry field cannot apply to hydroxyl. (Def. Br. at 6–7).

Ranbaxy also argues that the words of Claim 1, read as a whole in light of basic chemistry principles, and the '783 patent

---

8. The term "alkyl" refers to a residue containing at least one carbon atom bonded to one or more hydrogen atoms, where all the carbon-carbon bonds are single bonds. (Remmel Decl. ¶ 18.) The parties agree that the term "alkyl of up to three carbons," as used in the R$^4$ claim language, refers to at least three residues: (1) methyl (-CH$_3$), (2) ethyl (-CH$_2$-CH$_3$), and (3) propyl, including n-propyl (-CH$_2$-CH$_2$-CH$_3$) and isopropyl (-CH-(CH$_3$)-CH$_3$). (*Id.*; Sloan Supp. Decl. ¶ 6.)

specifications, support this claim construction. (Def. Br. at 6–11.) Those arguments are described and addressed *infra.*

Plaintiffs argue that the plain language of Claim 1 says that the hydroxyl can be "substituted by" an alkyl of up to three carbons to make up the $R^4$ structure, and that the other claim language and patent specifications support its proffered construction. Plaintiffs contend that a "methyl-substituted hydroxyl group" such as found in VANTIN® and the Ranbaxy product is squarely covered by the plain meaning of the $R^4$ claim language. (Pl. Reply Br. at 4–8.) Plaintiffs also oppose the extrinsic expert declaration provided by Ranbaxy regarding "common nomenclature" in the art, as well as Ranbaxy's other chemistry arguments pertaining to Claim 1 and the patent specifications, offering its own extrinsic evidence. (Sloan Supp. Decl. ¶¶ 5–18.) Our claim construction favors the position advocated by plaintiffs.

We turn first to the literal language of Claim 1 as it defines the $R^4$ structure. That language begins with the following phrase: "$R^4$ is a residue of a nucleophilic compound . . . ." It is undisputed that both an unsubstituted hydroxyl (-OH) and a methoxy group ($-OCH_3$) qualify as a "residue of a nucleophilic compound." (Pl. Reply Br. at 2–4.)

The next phrase of the $R^4$ limitation sets forth a so-called Markush group, listing eight structures as follows: "selected from hydroxyl, mercapto, cyano, azido, amino, carbamoyloxy, carbamoylthio and thiocarbamoyloxy . . . ." Of course it is un-

disputed that hydroxyl is one of the structures listed in this Markush group.

The final phrase of the $R^4$ limitation states: "said group being unsubstituted or substituted by alkyl of up to three carbons, . . . ." We first observe that the sentence structure of this phrase, following immediately after the listing of the eight-member Markush group, indicates that this language "said group being unsubstituted or substituted" applies to each of the eight structures listed in the Markush group. However, Ranbaxy raises the question whether all—or only some—of the members of the Markush group can in fact be "substituted by alkyl of up to three carbons," so as to be covered by the word "substituted" in this claim language.

The parties appear to agree that the term "substituted" is generally used by organic chemists to refer to removing a hydrogen atom from a residue and "substituting" something else in place of the hydrogen atom. (Def. Br. at 7, Remmel Decl. ¶ 13, Sloan Supp. Decl. ¶ 10.) Ranbaxy points out that as a matter of undisputed chemistry, two of the structures listed in the $R^4$ Markush group cannot be "substituted by alkyl of up to three carbons," namely cyano (-CN) and azido (-N=N=N), because they lack hydrogen atoms in their original form. (Remmel Decl. ¶ 12, Table 1; *id.* ¶ 19; Sloan Supp. Decl. ¶ 10.) Ranbaxy does acknowledge that the last four structures listed in the Markush group (amino, carbamoyloxy, carbamoylthio and thiocarbamoyloxy) can be so substituted, even using Ranbaxy's asserted nomenclature convention, discussed *infra.*[9] (Remmel Decl. ¶ 18.) That leaves

---

9. Dr. Remmel states that the last four named residues in the $R^4$ Markush group (amino, carbamoyloxy, carbamoylthio and thiocarbamoyloxy) "can be properly referred to as 'substituted' when substituted with one of these alkyl residues . . . . because, even after alkyl substitution of a hydrogen atom, the resulting

chemical structures are still amino, carbamoyloxy, carbamoylthio and thiocarbamoyloxy, respectively, and thus maintain the physical and chemical properties of those residues." (Remmel Decl. ¶ 18.) For example, an amino residue is characterized by a nitrogen atom attached to either hydrogen or car-

two of the structures, hydroxyl and mercapto, to be considered in this context.

Ranbaxy asserts that neither a hydroxyl nor a mercapto group can be "substituted by a lower alkyl group," according to conventional nomenclature. Dr. Remmel explains this point as follows:

> Referring to the other four listed $R^4$ residues of claim 1 ("hydroxyl," "mercapto," "cyano," and "azido") as being substituted by an "alkyl of up to three carbons" would be improper because to do so would violate the accepted conventions familiar to organic chemists for naming such residues. For example, replacing the hydrogen atom (H) of a hydroxyl residue (-OH) with an ethyl residue (-$C_2H_5$) would result in an ethoxy residue (-$OC_2H_5$), and would completely remove, rather than merely "substitute," the hydroxyl reside. It is incorrect to refer to an ethoxy residue as an "ethyl-substituted" hydroxyl residue because an ethoxy residue does not contain a hydroxyl residue, and thus does not have the general physical and chemical properties of a hydroxyl residue.... Likewise, a mercapto residue (-SH) is characterized by a sulfur-hydrogen (S–H) bond. A residue with an (S–C) bond is a thioether and therefore, replacing the hydrogen atom of a mercapto residue (S–H) with an alkyl residue such as methyl, ethyl or propyl would result in a thioether residue (thiomethyl, (-$SCH_3$), thioethyl (-$SC_2H_5$) or thiopropyl (-$SC_3H_7$ ), respectively), which does not contain a

sulfur-hydrogen bond. It is incorrect to refer to the thioether residue as an "alkyl-substituted" mercapto residue.

(Remmel Decl. ¶ 19 (emphasis added).)

Ranbaxy's position, as expressed by its extrinsic expert declaration, is that of the eight members of the Markush group listed in the $R^4$ limitation, two of those members cannot have a hydrogen atom "substituted" with a lower alkyl group as a matter of physical chemistry (cyano and axido) [a point which plaintiffs do not dispute], and two other members (hydroxyl and mercapto) cannot have a hydrogen atom "substituted" with a lower alkyl group as a matter of "accepted conventions familiar to organic chemists for naming such residues." (*Id.* (emphasis added).) The latter point is vigorously disputed by plaintiffs. Ranbaxy argues that based on this asserted naming convention, the "substituted for" language in the $R^4$ claim limitation can only refer to the four last-named members of the Markush group (amino, carbamoyloxy, carbamoylthio and thiocarbamoyloxy), and the hydroxyl group cannot be "substituted" with a lower alkyl group within the meaning of the claim language.[10]

Arguments are presented by Ranbaxy from the intrinsic evidence as well. First, Ranbaxy points to the language of Claim 1 defining the $R^5$ element: ."and $R^5$ is hydroxyl or lower alkoxy." ('783 patent, Col. 40:14.) Here Ranbaxy argues that "the inventors provided for $R^5$ of Claim 1 to cover methoxy using conventional nomen-

---

bon with a single bond. (*Id.* ¶ 13; *id.,* Ex. B.) The simplest amino residue is $NH_2$. (*Id.* ¶ 12, Table 1.) If a hydrogen atom (H) were removed from an amino residue and substituted with an alkyl of up to three carbons, such as methyl ($CH_3$), the resulting residue would still retain the characteristics of an amino residue (nitrogen atom attached to either hydrogen or carbon). (*Id.* ¶¶ 13, 18; *see* Def. Br. at 8.) The same reasoning is true for carbamoyloxy,

carbamoylthio and thiocarbamoyloxy. (Remmel Decl. ¶ 18.)

**10.** Ranbaxy adds that "[t]o the extent that the Court cannot determine to which group or groups the claim term 'said group being unsubstituted or substituted by [an] alkyl of up to three carbons' applies, then Claim 1 is invalid as being indefinite. 35 U.S.C. § 112, ¶ 2." (Def. Br. at 9, n. 6.)

clature ["lower alkoxy"] and could have easily done so for $R^4$ if they believed that it should cover methoxy." (Def. Br. at 9 (bracketed material added).) Regarding the patent prosecution history, Ranbaxy simply points out that throughout that long history, including predecessor applications, the inventors explained that the terms in the patent were being used according to conventional usage, and "nowhere create[d] an exception for *substituted hydroxyl.*" (*Id.* at 10, citing Canuso Decl., Exs. 4, 9, 12.)

Plaintiffs submit that the Claim 1 language defining both $R^4$ and $R^5$ is clear, unambiguous and consistent with both the patent specification and the prosecution history. The relevant portion of the $R^4$ limitation states: "hydroxyl ... unsubstituted or substituted by alkyl of up to three carbons." We agree that the plain meaning of that phrase is that hydroxyl can be "substituted" by such an alkyl. An exploration of the underlying chemistry, set forth above, shows that it is chemically feasible to "substitute" all members of the $R^4$ Markush group, except cyano and azido, by replacing the hydrogen atom with "alkyl of up to three carbons." Therefore it appears to this Court that the plain meaning of the $R^4$ language, read in the light of common chemistry principles, is that cyano and azido will be "unsubstituted," and the remaining six groups, including hydroxyl and mercapto, can be "unsubstituted or substituted by alkyl of up to three carbons."

The '783 patent specification[11] expresses this concept of substitution relating to a hydroxyl group in terms similar to the $R^4$ claim language itself:

The residue of nucleophilic compound shown by the symbol $R^4$ may be ... a group of the formula:

$-W-R$

wherein *W represents oxygen* or sulfur atom *and R represents hydrogen,* carbamoyl, N-alkylcarbamoyl, thiocarbamoyl, N-alkylthiocarbamoyl, an acyl, sulfamoyl, alkylsulfonyl or hetero ring. *The typical residue of nucleophilic compound may be exemplified by hydroxyl,* mercapto, cyano, azido, amino, carbamoyloxy, carbamoylthio or thiocarbamoyloxy group, *or those substituted with alkyl (e.g. methyl,* ethyl, propyl, etc.)....

('783 patent, Col. 4:61 to 5:8.) In addition, at several locations the '783 specification discusses a specific type of substituted hydroxyl, referred to as a "protected hydroxyl." Apparently in discussing the $R^5$ limitation, these portions of the specification explicitly describe a hydroxyl substituted with a methyl group (which as we know results in a methoxy, one of the "lower alkoxy" structures). (Sloan Supp. Decl. ¶¶ 17–18.)

Ranbaxy attempts to argue that since the patent covers "lower alkoxy" in $R^5$ using "conventional nomenclature," and describes that structure in the specification when referring to $R^5$, it would be inconsistent to describe the same structure in the $R^4$ limitation using different language. (Def. Br. at 9.) We are unpersuaded by this argument. As explained by plaintiffs, in comparison to the definition of $R^4$, the structure defined in $R^5$ is very simple, with few variations permitted. $R^5$ is limited to hydroxyl (-OH), or the substituted kind of structure known as lower alkoxy (e.g., methoxy ($-OCH_3$)). In con-

---

**11.** To the degree that this opinion refers to the specifications in the '783 patent, or in related earlier patents, we are relying upon Pharmacia's representation at oral argument, undisputed by Ranbaxy, that those specifications are pertinent to the '783 patent claims as issued. (Oral Arg. Tr. at 60–61.)

trast, the structure defined in $R^4$ has a great range of variability as it is based upon a large Markush group and myriad possible substitutions within that group.[12] (*See* Oral Arg. Tr. at 56–57.)

The other major intrinsic evidence argument advanced by Ranbaxy on this issue relates to the '783 patent specification, but that argument appears to be overcome upon a closer look at the specification. In its briefing materials, Ranbaxy stated that the specification "does not give any examples, whatsoever, in which the recited groups of Claim 1 are *substituted* with an *alkyl* residue in the $R^4$ position." (Def. Br. at 10.) While that is true, plaintiffs point out in reply that the '783 specification clearly gives an example of a mercapto residue being substituted with a hetero ring, which would break the sulfur-hydrogen (S–H) bond that Dr. Remmel said characterizes the mercapto group. Therefore, plaintiffs argue, this portion of the '783 specification contradicts Remmel's position that a mercapto group cannot be regarded in conventional nomenclature as "substituted." (Sloan Supp. Decl. ¶ 16; Pl. Reply Br. at 7–8, citing '783 patent, Col. 5:13–17.) At oral argument, Ranbaxy's rejoinder to this fact was that apparently the '783 patentee had determined to become "his own lexicographer" as to mercapto's ability to be "substituted," but provided no such specialized definition as to hydroxyl. (Oral Arg. at 75.) We find that argument unconvincing in light of the fact that neither the prosecution history nor the specification refers to using anything

but the usual and customary scientific meaning for the terms used in the patent.

There is no indication in the patent or its prosecution history that the patentee sought to be "his own lexicographer" as to any terms in the '783 patent, including the mercapto term. On the contrary, we interpret the presence of a specification showing a *substituted mercapto* to indicate that the patentee also intended substitution to be permitted for the hydroxyl structure under the Claim 1 definition of $R^4$. Since both substitutions are chemically feasible, we would expect that the person of ordinary skill in the art would understand the mercapto example in the specification to be illustrative of the availability of substitution also with respect to hydroxyl.

This Court finds no persuasive intrinsic evidence to support Ranbaxy's proffered construction of the $R^4$ limitation of Claim 1 as excluding a "substituted hydroxyl," such as methoxy ($-OCH_3$). We turn then to Rambaxy's extrinsic evidence, as presented by Dr. Remmel, to the effect that under "well-established rules of chemical nomenclature," the term "substituted" as used in $R^4$ cannot apply to hydroxyl. (Def. Br. at 7.) This position is summarized in the following excerpts from Dr. Remmel's opinion evidence:

> The ordinary and customary language of organic chemistry permits a chemist to name a particular residue as a "substituted" version of an "unsubstituted" residue if one could envision that the "substituted" residue was made by removing

---

12. Ranbaxy separately argues with reference to two other patents licensed to Pharmacia, which are disclosed Pharmacia's FDA disclosures for VANTIN®, that those patents define the structure corresponding to $R^4$ in the '783 patent "as alkoxy using standard nomenclature." (Def. Br. at 11.) Pharmacia states that those two patents are unrelated to the '783 patents; do not belong to the same family of patents as the '783 patent; they involved different inventors from different companies; and they were handled by different attorneys and different patent examiners. (Pl. Reply Br. at 10.) Based upon this state of the evidence at this juncture, we cannot allow the claim construction of the '783 patent to be based upon those apparently unrelated other patents.

a hydrogen atom (H) and replacing it ("substituting it") with a different atom or residue. However, this naming convention only applies when the resulting name (e.g., "substituted amino") is fully consistent with the physical and chemical properties of the resulting residue. (Remmel Decl. ¶ 13.)

Consistent with this naming convention, chemists would also not ordinarily refer to a residue as a "substituted" version of the "original" residue if the residue were so altered by the substitution that its basic chemical and physical characteristics were fundamentally changed.

(*Id.* ¶ 14.)

The class of residues containing an oxygen-carbon single bond are known as alkoxys, and are physically and chemically distinct from hydroxyl residues. *See* Exhibit B, *Chemistry* at pp. 850–855. Compounds having alkoxy residues are known as ethers and are characterized by the formula (–C–O–C). Compounds having hydroxyl residues are known as alcohols and are characterized by the formula (–C–O–H). *Id.* These distinct names reflect the distinct physical and chemical properties of ethers and alcohols.

(*Id.* ¶ 15.)

Referring to ... "hydroxyl" ... as being substituted by an "alkyl of up to three carbons" would be improper because to do so would violate the accepted conventions familiar to organic chemists for naming such residues. For example, replacing the hydrogen atom (H) of a hydroxyl residue (-OH) with an ethyl residue ($-C_2H_5$) would result in an ethoxy residue ($-OC_2H_5$), and would completely remove, rather than "substitute," the hydroxyl residue. It is incorrect to refer to an ethoxy residue as an "ethyl-substituted" hydroxyl residue because an ethoxy residue does not contain a hydroxyl residue, and thus does not have the general physical and chemical properties of a hydroxyl residue. The same is true for replacing the hydrogen atom of a hydroxyl residue with any other alkyl of up to three carbons.

(*Id.* ¶ 19.)

The chemical textbook cited by Dr. Remmel in the above passage is Bailar, et al., *Chemistry*, 850–55 (Academic Press, Inc.1978). That text describes "Functional groups with covalent single bonds," referring to a common system of nomenclature and dividing them into groups including Alcohols, called the "hydroxyl group," (*id.* at 850–53) and Ethers, including the "alkoxy group." (*Id.* at 854–55). However, that text language does not address the question presented here, which is whether chemists would understand that a "hydroxyl ... substituted by alkyl of up to three carbons" (Claim 1, R[4] limitation) means that the unsubstituted hydroxyl can be "substituted" by an alkoxy in the claimed invention.

Plaintiffs' extrinsic expert evidence cites textbook authority tending to show that one of ordinary skill in organic chemistry would clearly understand that the removal of a hydrogen (-H) atom from a hydroxyl group (-OH), and replacing the hydrogen with another group, is known as "substitution."[13] Plaintiffs' expert is aware of no

13. According to Dr. Sloan, the following source is a highly respected Organic Chemistry textbook of the period relevant to this patent, which states:

Reaction of an alcohol involves the breaking of either of two bonds: the C–OH bond with the removal of the -OH group; or the O–H bond, with the removal of -H. Either kind of reaction can involve substitution, in which a group replaces the -OH or -H ....

such "naming convention" to the contrary. (Sloan Supp. Decl. ¶ 11.) Further, plaintiffs' expert states that "while substitutions virtually always change the physical and chemical properties of the starting compound to some degree[ ], [t]he same would also be true of those compounds that [Remmel] admits may be substituted."[14] (*Id.* ¶ 13.)

The Court concludes from examination of the extrinsic expert evidence presented by both parties that plaintiffs' points are more responsive to the issue of interpreting the $R^4$ limitation of Claim 1, and that they appear to be based upon the applicable scientific authority and reasoning. Based upon that evidence, at this preliminary stage of the case, we are unable to agree that during the relevant period there was a generally accepted "nomenclature convention" regarding the meaning of "substituted," such as described by Ranbaxy. We find more persuasive the expert declaration testimony and textbook authority provided by plaintiffs on this issue. In short, we have not found in the extrinsic evidence any reason to deviate from the claim construction that appears appropriate based upon the intrinsic evidence discussed above.[15]

■ Based upon the analysis set forth above, and for purposes of this preliminary injunction motion only, this Court hereby construes the claimed $R^4$ limitation of Claim 1 of the '783 patent as follows: The words "said group being unsubstituted or substituted by alkyl of up to three carbons" mean that (1) all of the structures named in the Markush group may be used in their unsubstituted form; and (2) all of the structures named in the Markush group that *can* be chemically "substituted" by replacing a hydrogen atom with "alkyl of up to three carbons," *may* be so substituted within the meaning of the $R^4$ limitation. This leads to the conclusion that an alkoxy residue such as methoxy ($-OCH_3$) may be substituted for the hydroxyl residue ($-OH$) within the meaning of the $R^4$ limitation of Claim 1.

### 3. *Comparing Construed $R^4$ Claim to Accused Product*

The second step of a literal infringement analysis is to compare the claim, as construed, to the accused product to determine whether the accused product contains every limitation of the claim. *Strattec Sec. Corp. v. Gen. Auto. Spec. Co.*, 126 F.3d 1411, 1418–19 (Fed.Cir.1997). Ranbaxy's

(Sloan Supp. Decl. ¶ 12; *id.*, Ex. A: Morrison & Boyd, *Organic Chemistry*, 518 (3d ed., 1973) (emphasis added).)

14. Dr. Sloan states:
    Indeed many well-recognized substitutions can have far more drastic effects on the starting compound than the substitution of a methyl group ($CH_3$) for a hydrogen (H) on a hydroxyl ($-OH$) group at the $R^4$ position of the compound claimed in Claim I to form methoxy. For example, the substitution of the $-H$ in the compound in the $-COOH$ group of claim 1 of the '783 patent to form the compound claimed in claim 2 of the patent is unquestionably a substitution, yet it yields a substantially different product with substantially different properties. Dr. Remmel's argument that the sub-

stitution by definition cannot change the physical or chemical properties of the group is simply not scientifically correct. (Sloan Supp. Decl. ¶ 13.)

15. The Court has not ignored the principle that dictionaries and treatises are to be considered "intrinsic" evidence, always available for a court to consult in performing claim construction. *Tex. Digital Sys., Inc.*, 308 F.3d at 1201–05. The treatises discussed in this opinion were presented in the setting of expert declaration testimony, which included the experts' interpretations of what the treatises conveyed. The experts' interpretations thus remain extrinsic evidence, although the Court has also independently examined the treatise passages cited by the experts.

primary position on literal infringement is simply that "methoxy at the $R^4$ position does not satisfy the $R^4$ limitation of Claim 1."[16] (Def. Br. at 12.) The Court has made a preliminary determination, in the preceding section, that the $R^4$ limitation is construed to cover an alkoxy group such as methoxy. The Ranbaxy product contains a methoxy residue at the $R^4$ position in its chemical structure. (Id. at 6.) We find that plaintiffs have met their burden of showing a reasonable likelihood of success on the merits of their claim of literal infringement, based on this claim construction and the undisputed chemical structure of the accused product.[17]

## C. *Likelihood of Success—Invalidity Issue*

■■■ Ranbaxy asserts that Claim 1 of the '783 patent is invalid for obviousness-type double patenting. (Def. Br. at 15–20.) This occurs when a later-issued patent claim covers an obvious variation of an earlier claim. *In re Goodman*, 11 F.3d 1046, 1052 (Fed.Cir.1993). The doctrine applies to claims that are obvious over claims in a previously issued patent owned by the same patentee. An inventor may overcome an obviousness-type double patenting rejection by the PTO by filing a terminal disclaimer, agreeing that if the later-applied-for patent issues, it will expire at the same time as the earlier-issued patent. (Id.) Where an earlier-issued pat-

ent has already expired at the time of litigation, a court finding of obviousness-type double patenting will support a judgment of invalidity of the later-issued patent. *See Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968–72 n. 5 (Fed.Cir. 2001); *Georgia–Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1328 (Fed.Cir. 1999).

■■■ The standard of proof for a party alleging invalidity on this ground of obviousness is clear and convincing evidence. In order to sustain its burden on this claim during the litigation, Ranbaxy will be required to prove by clear and convincing evidence that Claim 1 of the '783 patent was obvious to persons of skill in the art in view of the claims of the prior-issued patent. *Symbol Tech., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed. Cir.1991). The law also provides that where the later-issued patent does not preclude the public from making compounds claimed in the earlier issued patent, there can be no finding of double patenting. *Id.* at 1581; *In re Kaplan*, 789 F.2d 1574, 1578 (Fed.Cir.1986).

The patent prosecution history of the '783 patent is quite lengthy and complex. (*See* Zimmerman Decl., Ex. 15.) However, for present purposes the following facts are relevant. U.S. Patent No. 4,098,888 ("the '888 patent") was issued on July 4, 1978 and expired on July 4, 1995.

---

16. Ranbaxy does contend (in a footnote) that plaintiffs also cannot prove literal infringement of Claim 1 because plaintiffs do not offer any evidence to prove that Ranbaxy's product converts to carboxylic acid (-COOH) once inside the body, as claimed in the carboxylic acid limitation of Claim 1. (Def. Br. at 12, n. 7.) We will assume, for purposes of this motion only, that since Pharmacia has long experience marketing VANTIN®, and since Ranbaxy's product is a exact chemical copy of VANTIN®, plaintiffs can produce reliable evidence to establish that fact.

17. This preliminary holding of literal infringement renders it unnecessary for the Court to proceed to an analysis of the alternative theory of infringement under the doctrine of equivalents at this stage. Neither party has waived any arguments under this theory. (Def. Br. at 13–15; Oral Arg. Tr. at 66.) Therefore it remains as a potential issue for adjudication.

(*Id.*) During prosecution of the '888 patent, the examiner issued a restriction requirement. (Canuso Decl., Ex. 4 ('888 prosecution history, 7–12–76 Office Action at 2–3).) The examiner divided the originally-filed claims into four groups, reflecting a determination that the claims as filed reflected more than one invention. One group of claims covered compounds in which $R^4$ was referred to by the examiner as a "heterothio" residue.[18] (*Id.* at 2.)

The '888 patent was issued with a structure designated "$R^4$" and defined as follows:

[H]eterocyclic thio wherein heterocyclic is a 5 to 6 membered hetero ring containing 1 to 4 hetero atoms from the group of oxygen, sulfur and nitrogen, sulfur and nitrogen, said ring being un-substituted or substituted by lower alkyl, lower alkoxy, halogen, haloalkyl, amino, mercapto, hydroxy, carbamoyl, or carboxy.

(Canuso Decl., Ex. 3 ('888 patent, Claim 1, Col. 38:2–8) (emphasis added).)

A later-filed application by the same inventors resulted in issuance of U.S. Patent No. 4,355,160 ("the '160 patent") on October 19, 1982. (Zimmerman Decl., Ex. 15.) The '160 patent contained a similar definition of $R^4$ as a heterocyclic thio.[19] Due to this similarity, the Patent Office issued the '160 patent subject to a terminal disclaimer under which the '160 patent expired on the same date as the earlier-issued '888 patent.[20] (*Id.*, Ex. 14, 15; Canuso Decl., Ex. 6 ('160 patent).) Those patents have expired and their claims are in the public domain. (Sloan Supp. Decl. ¶ 25; Pl. Reply Br. at 12.)

There was no terminal disclaimer required by the PTO in the '783 patent prosecution history, despite the fact that the '888 and '160 patents existed during that period and all three applications were handled by the same examiner. (Pl. Reply Br. at 14.) Ranbaxy here contends that the definition of $R^4$ contained in Claim 1 of the '783 patent contains a limitation that is so similar to the definition of $R^4$ in the '888 and '160 patents as to have been obvious in light of that prior art, and

18. The patent examiner stated in pertinent part as follows:

Restriction is required under 35 USC 121 between the following inventions:
. . . .
II. Compounds where $R_3$ is -$OCH_3$ and $R_4$ is heterothio, embracive of claim 13.
III. Compounds where $R_3$ is H and $R_4$ is heterothio, embracive of claims 10, 12 and 14.
. . . .
Restriction is proper as between groups I–IV since each group defines a different concept in cephalosporius. Compounds where $R_3$ is $OCH_3$ or compounds where $R_4$ is heterothio require additional chemical steps to achieve them whereas many cephalosporins where $R_3$ is H and $R_4$ is acetoxy are isolated directly from a reaction broth. Therefore the compounds of Group I can be regarded as starting materials and the compounds of groups III and IV can be regarded as intermediates to the compounds of group II, as well as being antibacterials. This is evidence that each group is independent and distinct from the others.
(Canuso Decl., Ex. 4 ('888 prosecution history, 7–12–76 Office Action at 2–3) (emphasis added) (handwritten portion in original).)

19. The definition of the $R^4$ structure in the claim language of the '160 patent was as follows:

[H]eterocyclic thio wherein heterocyclic is a 5 to 6 membered hetero ring containing 1 to 4 hetero atoms from the group of oxygen, sulfur and nitrogen.
(Canuso Decl., Ex. 6 ('160 patent, Claim 1, Col. 40:4–7) (emphasis added).)

20. Yet another patent in this prosecution family was issued subject to the same terminal disclaimer that applied to the '160 patent. That was U.S. Patent No. 4,973,684 ("the '684 patent"), which issued on November 27, 1990 [after issuance of the '783 patent] and expired on July 4, 1995. (Zimmerman Decl., Ex. 15.)

therefore the '783 patent should have been issued with a terminal disclaimer that would have caused it to expire on July 4, 1995 with the '888 and '160 patents. Based upon this contention, Ranbaxy intends to seek a judgment declaring the '783 patent to be invalid from and after July 4, 1995, which would defeat all of plaintiffs' claims in this case. (Def. Br. at 15–20.)

An obviousness-type double patenting analysis involves two steps: (1) as a matter of law, the court construes the claims in the earlier and later patents and determines the differences; and (2) the court then determines "whether the differences in subject matter between two claims render the claims patentably distinct." *Eli Lilly,* 251 F.3d at 968. "A later patent claim is not patentably distinct from an earlier claim if the later claim is obvious over, or anticipated by, the earlier patent claim." *Id.*

The pertinent claim language of the '888 and '160 patents is quoted above. (*See* n. 19 *supra* and accompanying text.) The pertinent claim language of Claim 1 of the '783 patent states:

> $R^4$ is a residue of a nucleophilic compound selected from ... carbamoylthio
> ....

('783 patent, Col. 40:10–12.)

Ranbaxy argues that the "heterothio" residue that the patent examiner referred to in issuing the restriction requirement in the prosecution history of the '888 patent should be understood to refer to all heterothios, including the heterocyclic thios that were defined in the '888 and '160 patents as issued. (Def. Br. at 16.) Relying exclusively upon extrinsic evidence in the form of its expert opinion declaration, Ranbaxy defines a "heterothio" residue as "one that contains a connecting sulfur atom, as well as one or more nitrogen, sulfur, and/or oxygen atoms." (Remmel Decl. ¶ 23.)

The same source defines a "heterocyclic thio" as "a type of heterothio residue that contains a heterocyclic ring (a ring containing one or more sulfur, nitrogen and/or oxygen atoms in place of carbon atoms) and a connecting sulfur atom," adding that "[b]oth the general term 'heterothio' and the more specific term 'heterocyclic thio' refer to residues that are residues of nucleophiles." (*Id.*)

Ranbaxy's expert next offers that the "carbamoylthio" in the Markush group named in the $R^4$ limitation of the '783 patent is a member of a larger "heterothio" residue group, which also includes the "heterocyclic thio" defined in the '888 and '160 patents. (*Id.*) He then states that "[t]he carbamoylthio residue listed in Claim 1 of the '783 patent represents another type of heterothio residue because it contains a connecting sulfur atom and a nitrogen atom." (*Id.* ¶ 24.) Therefore, according to this view, the examiner should not have allowed the '783 patent to issue without a terminal disclaimer tied to the expiration of the '888 and '160 patents, because the use of a carbamoylthio instead of a heterocyclic thio would have been obvious. (Def. Br. at 18.)

Pharmacia points out that the term "heterothio" is not found in any of the claims or specifications in the prosecution history of the '888 and '160 patents. Rather, the term uniformly found in the applicant's submissions for the '888 and '160 patents was "heterocyclic thio." (Pl. Reply Br. at 12.) Apparently the lone use of the word "heterothio" in that prosecution history is found in the examiner's statement issuing the Office Action which imposed the restriction requirement upon the original application for the '888 patent. (Oral Arg. Tr. at 131.) Pharmacia provides expert opinion evidence that the ring-shaped chemical structure of the heterocyclic thio,

found in the '888 and '160 patents, would not be viewed by an organic chemist as similar to the linear structure of the carbamoyl. (Sloan Supp. Decl. ¶ 21 ("Because of its chemical properties, carbamoylthio cannot become a cyclic (ring) compound and still be a carbamoylthio.").) Pharmacia's evidence further suggests that the presence or absence of a ring structure gives the molecules substantially different characteristics from carbamoylthio, and precludes making any comparison or judgment about their respective antibiotic properties. (*Id.* ¶ 23.) Finally, Pharmacia's extrinsic evidence takes issue with the undocumented proposition of Ranbaxy's expert that there is any such group as a "heterothio" residue in common chemical understanding, but states that even accepting the chemical definition of the term "heterothio" offered by Ranbaxy's expert, it would *not* include carbamoylthio. (*Id.* ¶¶ 19–22.)

This Court has considered the intrinsic evidence pertaining to this issue, and has evaluated the extrinsic expert opinion evidence offered by both parties. It appears that the term "heterothio" is not found in any of the submissions by the patentee during the prosecution of the '888 or '160 patents, and may have been a misnomer on the one occasion where it was used by the examiner issuing the original restriction requirement. In any event, no textual reference to such a term in a scientific dictionary or treatise has been provided to the Court to date.

■ We do find, as a preliminary matter on this motion, that the cyclical, ring-like structure of the "heterocyclic thio"

that was approved in the '888 and '160 patents is markedly different in both form and function from the "carbamoylthio" taught in the '783 patent. (*See* Sloan Supp. Decl. ¶¶ 19–24.) We also find that the definition of "heterothio" proffered by Ranbaxy *would not* in any event cover the structure of a carbamoylthio, and *would* cover an array too large to confine to this family of patents. (*See id.*)

Based upon this analysis, for purposes of this motion we will construe the "heterocyclic thio" limitation in the '888 and '160 patents to be limited to that heterocylic ring structure and any obvious variants thereof; and we will construe the "carbamoylthio" limitation in the '783 patent as in any event beyond the obvious variants of a heterocyclic thio. We further reject Ranbaxy's proffered definition of a class of "heterothio" residues as not adequately supported by intrinsic or extrinsic evidence in this case to date.[21] Accordingly, we find that Ranbaxy has not demonstrated, at this juncture in the case, a likelihood that it will show by clear and convincing evidence that the '783 patent is invalid for obviousness-type double patenting over the '888 and '160 patents. For these reasons, we find that plaintiffs have met their burden of showing a likelihood of success on this issue as well.

**D.** *Likelihood of Irreparable Harm to Movant*

■ Pharmacia has developed its VANTIN® product to be a significant oral pharmaceutical antibiotic. Annual sales of VANTIN® were almost 50 million dollars

---

21. Ranbaxy also urges the Court to consider, on this invalidity issue regarding the '783 patent, certain statements made to the PTO in the prosecution of the later-issued '684 patent. (Def. Br. at 18–19.) That '684 patent was subject to the terminal date of the '888 and '160 patents. (*See* n. 20 *supra*.) While we have considered that argument, we do not see it—at least at this stage—to be sufficiently persuasive to rise to the level of clear and convincing evidence to show obviousness of the R[4] limitation in the '783 patent. (*See, e.g.,* Sloan Supp. Decl. ¶¶ 23–24.)

per year for at least the two years preceding this motion. (Wilp Decl. ¶ 5.) Ranbaxy already has FDA approval for the suspension form of its product, and expects FDA approval for the tablet form in the near future. Ranbaxy stands ready to market its suspension product now, and to market its tablet product immediately upon obtaining regulatory approval. (*See* n. 4 *supra.*)

Plaintiffs predict that Ranbaxy's introduction of a generic form of VANTIN® during the remaining life of the '783 patent will immediately, seriously and irreparably harm Pharmacia. This projected harm is expected to take the form of loss of the remaining relatively short life of the patent, irretrievable price and market erosion for the patented product, loss of current research opportunities resulting from loss of funding, and the speculative nature of damage assessments. (Wilp.Decl.¶¶ 5–9.) This Court recognizes that the proper measure of damages is generally lost profits, rather than gross or net sales. *Glaxo Group Ltd. v. Ranbaxy Pharms., Inc.*, 262 F.3d 1333, 1339 (Fed.Cir.2001). Still, the size of any anticipated damages award and the difficulty of pursuing collection of that award in international legal systems are factors to weigh in determining the likelihood of irreparable harm.

There is patent law authority that where there has been a strong showing of the likelihood of success on the merits, a court should presume irreparable harm. *Canon*, 134 F.3d at 1090; *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1571 (Fed. Cir.1996). This Court concludes that plaintiffs have made the requisite strong showing for a presumption of irreparable harm to apply. We also conclude that the factual account of Pharmacia's anticipated harm lends further support to our finding of the likelihood of irreparable harm to the movant in the absence of injunctive relief.

### E. *Balance of Hardships and the Public Interest*

■■■ Ranbaxy alleges that it faces a commensurate specter of immediate and irreparable harm if it is wrongly enjoined from selling its cefpodoxime proxetil antibiotics during the pendency of such injunction. (Def. Br. at 24.) Its executives state that in the pharmaceutical market, the first company to enter the market with a generic version of a drug has a distinct advantage over later entrants. (Chattaraj Decl. ¶ 11.) It envisions that if enjoined from this market, it will lose those competitive advantages, as well as the incalculable value of the name recognition attendant to being the first generic supplier on the market. (*Id.* ¶¶ 11–14.) While all of those competitive pressures are clearly real, it is difficult to envision that these plaintiffs will fail to enforce the '783 patent just as vigorously against any other generic entrant until that patent expires. It also appears that Ranbaxy already enjoys the competitive lead associated with being near the end of the ANDA approval process for its product.

The public interests that must be balanced in a situation such as this are well recognized. Surely the public has an interest in receiving the benefit of ANDA-approved generic drugs as soon as those products can lawfully come to market. *Glaxo, Inc. v. Novopharm Ltd.*, 110 F.3d 1562, 1568 (Fed.Cir.1997). On the other hand, the public has a long-term interest in the benefits derived from the recognition and enforcement of intellectual property rights. *Smith Int'l. Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir. 1983). Balancing these strong competing public interests also leads us to conclude that preliminary injunction is appropriate in this case.

### III. *CONCLUSION*

This Court has found that plaintiffs have satisfied all four of the factors required to demonstrate entitlement to a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. The Court will consult with counsel to determine the form of the order and the bond requirements.